# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00316-CR

**Gary Neil Matney II, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. CR2007-416, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Gary Neil Matney II of burglary of a habitation with intent to commit aggravated assault and assessed punishment at sixty years' imprisonment. Appellant appeals the trial court's judgment, contending that the evidence is legally and factually insufficient to support his conviction. We affirm the trial court's judgment.

## BACKGROUND

The evidence at trial showed that in the early morning hours of October 13, 2007, appellant went to the home of Terry Kight in Canyon Lake, Texas, and began breaking glass windows that were located immediately next to the front door. At the time, he was under a court order to stay away from Kight and her home. He and Kight had previously dated for more than three years and had a one-year-old daughter, R.M. Kight also had two other children, a fifteen-year-old daughter, S.K., and a twelve-year-old son, D.K. Kight lived in her home with her three children

and her mother, Sharon Davis. At the time of the incident, Kight was not at home, but Davis and Kight's three children were in the home sleeping when they were awakened by the sound of breaking glass.

Davis testified that she woke up when she heard glass breaking and her grandson D.K. scream, "Granny, somebody is breaking in[to] the house." Davis immediately got out of bed and ran to the front door. When she arrived, she saw appellant breaking glass windows directly to the side of the door and reaching in through the broken glass to unlock the door. After unlocking the door, appellant realized that the door still would not open because of a long piece of wood barring it. A neighbor had recently installed the wooden bar as a barricade to keep appellant out of the home. The bar could be lowered across the door and bolted into place so that a person outside could not enter. At the time of the incident, the bar was across the door, but it was missing the bolt necessary to hold it in place. Appellant began trying to lift the bar. When Davis saw what he was doing, she ran toward the bar, grabbed it, and held it down with her body weight.

By that time, S.K. had also run to the front door, where she saw appellant using a metal rod to break a window next to the door. Davis told S.K. to call 9-1-1, which S.K. did. While S.K. was on the phone, she saw appellant using the metal rod to break more windows next to the door and then break a window within the top part of the door, shattering it and sending pieces of glass falling onto Davis's head. S.K. also saw appellant use the metal rod to hit Davis in the side at least once. Davis testified that appellant "stabbed," "jabbed," and "poked" the metal rod at her, trying to get her away from the door, and he hit her with the rod once, leaving a bruise. He also kicked the door three or four times, trying to break through the barricade. Davis and S.K. testified

2

that appellant screamed at Davis throughout the incident, calling her names and cussing at her. At one point, he yelled, "Die, Bitch," to Davis and spit in her face through the broken window. He also repeatedly demanded that Davis tell him where Kight and his daughter were.

Meanwhile, Kight's neighbors, brothers David and Shannon Norman, were awakened by appellant's screaming and the sound of breaking glass. David Norman (David) went out to his porch and saw appellant on Kight's porch putting his arm through the broken window next to the door and trying to open the door. David yelled at appellant to leave, and appellant yelled back, "Well, come get you some." In response, David yelled that he did not want any problems and only wanted appellant to leave. David then went back inside his house to get his brother Shannon, and the two of them went over to Kight's house. By the time they got there, appellant was no longer there. Davis testified that appellant left after David initially yelled at him. David and Shannon began looking around outside the home for appellant but could not find him. While they were looking, the police arrived. After speaking with the police, Shannon left in his car to find Kight, who was at a friend's house, and tell her to go home. As the police officers began searching for appellant, David waited on the porch of Kight's home with Davis. One of the officers stayed with them and asked Davis to sit down and begin completing her written statement.

Shortly after, Kight arrived and stood on the porch near her mother. Within minutes, appellant, who had blood on his clothes and arms, arrived on the porch and said, "There you are," to Kight. The officer on the porch immediately pulled out his gun and ordered appellant to get on the ground. Other officers arrived, and they handcuffed appellant, who was beginning to struggle with them. When the officers brought appellant to his feet and began walking him off the porch, he

3

lunged at Davis and kicked her. Officers then took him to the ground once more, trying to regain control of him. Once they did, they picked him up and walked him off the porch toward their patrol cars. Near the patrol cars, appellant began kicking at the officers and spitting blood at them. Officers took appellant to the ground for a third time, but he continued spitting at them from the ground. One of the officers warned him that if he did not stop his behavior, the officer would use pepper spray against him. In response, appellant yelled, "Go ahead spray me," several times. Eventually, the officer sprayed appellant with pepper spray. Appellant continued to spit at officers but eventually calmed down and was treated by EMS personnel who were called to the scene. Officers then transported appellant to the hospital for further treatment.

**STANDARDS OF REVIEW**

In determining the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the verdict. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).

In reviewing factual sufficiency, we must weigh all the evidence in a neutral light and set the finding aside only if the evidence is so weak that the verdict seems clearly wrong or manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). An appellate court must be appropriately deferential to the jury's verdict in order to avoid substituting its own judgment for that

4

of the factfinder. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Id*.

## DISCUSSION

Appellant contends that the evidence is legally and factually insufficient to support his conviction for burglary of a habitation with intent to commit aggravated assault.[1] Specifically, appellant argues that the evidence is insufficient to establish that he intended to commit an aggravated assault because the evidence did not show that he intended: (1) to cause serious bodily injury to another person; or (2) to use or exhibit a deadly weapon during the commission of an assault. *See* Tex. Penal Code Ann. § 22.02(a) (West 2007).

Appellant concedes that the evidence establishes that he intended to use the metal rod to gain entry to Kight's house, but he argues that the evidence is insufficient to prove that he intended to cause serious bodily injury to Davis or Kight's children. A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id*. § 6.03(a) (West 2007). Intent may be inferred from circumstantial evidence such as the person's acts, words, and conduct. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). We should look at events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to do the prohibited act. *Id*. at 49.

---

[1] When the state charges a defendant with burglary of a habitation with intent to commit aggravated assault, the state is not required to prove that an aggravated assault actually occurred. *See Jacob v. State*, 892 S.W.2d 905, 908-09 (Tex. Crim. App. 1995). Rather, the state must show only that the defendant *intended* to commit aggravated assault at the time that he entered the habitation. *See id*. at 909; *Conrad v. State*, 230 S.W.2d 225, 226 (Tex. Crim. App. 1950).

A review of the record shows that appellant used the metal rod to break several windows around and within the front door of Kight's home and that he "stabbed," "jabbed," and "poked" the metal rod at Davis, hitting her at least once with enough force to cause bruising. While he was breaking the windows, he also yelled "Die, Bitch," to Davis, called her other names, cussed at her, and spit in her face. Davis testified that she had no doubt in her mind that he would have killed her if he had gotten inside the house and that she thought he would also kill S.K. and D.K. and then take R.M. Specifically, Davis testified that as she held the bar down, she thought, "If he gets in, my grandkids are dead." S.K. testified that she thought appellant was trying to seriously hurt or kill Davis with the metal rod and that if appellant had gotten into the house, he would likely have killed Davis, S.K. and D.K. and then taken R.M., or killed Davis and taken R.M., leaving S.K. and D.K. alone. One of the officers who reported to the scene testified that based on the evidence he gathered at the scene, he thought that appellant likely would have beaten Davis with the metal rod, potentially causing serious bodily injury or death, if he had gained entry to the house. Davis and S.K. testified that even after appellant was captured by police, he lunged at Davis, kicking her. Other witnesses saw appellant lunge at Davis but did not see his leg make contact with her. Appellant did not testify or present any evidence at trial.

Considering the evidence in the light most favorable to the verdict and in a neutral light—including appellant's violent conduct both during and after the offense and his use of threatening and derogatory language—we conclude that the evidence is sufficient to support a finding that appellant intended to cause Davis serious bodily injury at the time of the burglary. *See Ortiz v. State*, 993 S.W.2d 892, 894 (Tex. App.—Fort Worth 1999, no pet.) (attacker's assertive

6

conduct with weapon may be evidence of intent to use weapon to inflict serious bodily injury or death); *Joseph v. State*, 679 S.W.2d 728, 730 (Tex. App.—Houston [1st Dist.] 1984, no writ) (intent may be inferred from events occurring while burglary in progress).

Because we determine that the evidence is legally and factually sufficient to establish that appellant intended to cause serious bodily injury to Davis, we need not decide whether the evidence is sufficient to establish that he intended to use or exhibit a deadly weapon during the commission of the assault. *See* Tex. Penal Code Ann. § 22.02(a) (requiring proof of only one of two conditions to establish aggravated assault).

## CONCLUSION

Because we conclude that the evidence is legally and factually sufficient to support appellant's conviction, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed:   December 31, 2008

Do Not Publish