Manuel VASQUEZ, Appellant,

v.

The STATE of Texas.

No. 73729.

Court of Criminal Appeals of Texas.

Feb. 6, 2002.

Wendellyn K. Rush, Seguin, for Appellant.

Enrico B. Valdez, Asst. DA, San Antonio, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

KELLER, P.J., delivered the opinion of the Court which MEYERS, PRICE, WOMACK, KEASLER, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted in November 1999 of the capital murder of Juanita Ybarra.[1] Pursuant to the jury's answers to the special issues ·set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises four points of error. We will affirm.

### A. BACKGROUND

#### 1. Johnny Joe Cruz

The jury charge correctly identified Johnny Joe Cruz as an accomplice as a matter of law. Although initially charged with capital murder, Cruz pled guilty, pursuant to a plea bargain, to aggravated robbery in exchange for a seven year prison sentence. The terms of the bargain

---

1. Texas Penal Code § 19.03(a)(2): "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit ... robbery."

2. Article 37.071, § 2(g). Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

3. Article 37.071 § 2(h).

called for him to testify truthfully at appellant's trial. Sentencing in Cruz's case was delayed until after his testimony in appellant's prosecution.

According to Cruz, appellant was a member of the Mexican Mafia. Two days before the incident giving rise to the present prosecution, Oligario Lujan and appellant told Cruz that Juanita Ybarra "had to go down" because she failed to pay the "dime," a ten percent tax on the sale of illegal drugs collected by the Mexican Mafia. The "hit" had been ordered by Rene Munoz, a ranking member of the Mexican Mafia. Cruz testified that "had to go down" were "street words" that meant that Ybarra had to be killed. Cruz also testified that the plan included robbing Ybarra as a means of collecting the ten percent owed.

Appellant had rented room 20 of the New Laredo Motel. On the evening of March 18, 1998, Cruz and many others in room 20 were partying, smoking marijuana, drinking beer, injecting heroin, and snorting cocaine. At around 5:30 to 6:30 the next morning appellant asked Michelle Rodriguez for her car keys. Appellant, Cruz, and Lujan then headed toward room 15, where Ybarra was staying. They carried bandannas to cover their faces and socks to cover their hands to prevent fingerprints. Lujan knocked on the door to room 15 while appellant and Cruz ducked into adjacent room 16, the door to which was open, and began putting on socks and bandannas.

Moses Bazan, Ybarra's boyfriend, opened the door to room 15, leaving the chain locked. The three conspirators forced their way through the door and the chain broke loose. Cruz and Lujan wrestled Bazan to the floor while appellant held Ybarra to the ground. During this struggle, Bazan broke a window, but he soon lost consciousness. Appellant then asked for a telephone cord, and Lujan gave him one. Using the cord, appellant strangled Ybarra. Bazan regained consciousness and resumed struggling. Lujan fought with Bazan while Cruz began gathering valuables, including cameras and jewelry, and stuffing them into a pillowcase. Appellant threw Lujan a kitchen knife, and Lujan moved to stab Bazan but missed and hit the floor, bending the knife. During the struggle, Bazan kicked a hole in the wall to adjacent room 16. At that point, appellant joined the fight against Bazan and hit Bazan on the head with a gun. Bazan lost consciousness again, and appellant and Lujan began gathering valuables into pillowcases. Soon they heard police sirens, and they left the room and drove Rodriguez's car to George Martinez's house.

Because the three were covered in blood, they changed clothes at Martinez's house. Appellant had been wearing blue warmups during the crime. The three men then went to the Mayfield Motel, where they watched the news and used some drugs. After a couple of hours, they returned to Martinez's house. A little while later, Cruz left in Rodriguez's car without his companions but with several other people. Cruz picked up some food at the store and then went to his mother's house.

According to Cruz, he was arrested later that afternoon. However, a police officer later testified that Cruz was arrested the following day, March 20. In closing argument, the prosecutor conceded that Cruz's testimony in this regard was inaccurate.[4]

4. The prosecutor stated:
 Now, if according to the Defendant's theory the State spoon-fed Johnny Joe this story, well, we could have done a better job, couldn't we? There are some inconsistencies. There is the screw-up about the date

On cross-examination, Cruz admitted that he lied to the police in his initial statements. He had falsely identified Lujan as Ybarra's killer because he was afraid that appellant might place a hit on him. He also had falsely stated that Lujan had bragged about the killing. And he had made several false statements regarding his role in the offense and what happened afterwards.

## 2. Moses Bazan

Moses Bazan survived the attack and testified at trial. According to Bazan, he and Ybarra occupied room 15 of the New Laredo Motel on March 18 and 19, 1998. Bazan testified that Ybarra was scared and nervous that week and did not want to be alone. On the evening of the 18th, Bazan encountered Cruz, Lujan, and appellant in the parking lot at various points in time. At 9:00 p.m. Bazan used some cocaine. Ybarra drank a couple of beers and went to bed. Bazan went to bed after midnight.

At around 3:00 a.m., Lujan knocked on the door, identified himself, and told the occupants of the room to open the door. Bazan opened the door and three or four men pushed the door open and burst into the room. They had their faces covered by cloth,[5] but Bazan was able to identify three of them when the cloths were later removed. Although Bazan offered to give the intruders his wallet, they began slugging him. Appellant moved towards Ybarra, placed his hands upon her, and tried to choke her. Cruz and Lujan tied Bazan's legs and hands. Bazan was hit and kicked during the struggle and some ribs on his left side were broken. Cruz stabbed Bazan in the head with a knife and placed an extension cord around Bazan's neck while Lujan attempted to choke Bazan with his hands. At some point, Lujan took the knife from Cruz and began stabbing Bazan or possibly hitting Bazan with a gun. Ybarra bit appellant on the hand, and appellant yelled, "She's biting me!" Bazan then saw and heard appellant strike Ybarra. Cruz went to assist appellant. Ybarra yelled for help as appellant struck her over ten times. Bazan also yelled for help while he was fighting with Cruz and Lujan. During the struggle, Bazan broke a window and punched a hole in the wall to adjacent room 16. Cruz went back and forth between Bazan and Ybarra. While Cruz was attempting to strangle him with an extension cord, Bazan saw appellant punching Ybarra and heard her final cry before she died.[6]

During the robbery, Bazan saw the conspirators gathering valuables. At some point, after being stabbed numerous times, Bazan decided to play dead and rolled his eyes back into his head so that only the whites were showing. He heard a conversation in which someone said they should cut Bazan into pieces and throw him into the lake. However, the men were having difficulty moving Bazan, and one of them said "Let's get out of here. We've been

of the arrest. Okay? When we talk to witnesses, we take what they tell us and we work with it. Okay? Yeah, there was a screw-up. There's a day lost. But what you've got [sic] remember is that these guys, Lujan, Johnny Joe and "Meme" were all junkies. They were shooting heroin, they were shooting cocaine. And yeah, Johnny Joe may not have his time sequence down right, and I will concede that.

5. In cross-examination, Bazan indicated that Lujan and Cruz were not wearing masks when Bazan looked out the window before opening the door.

6. In earlier direct testimony, Bazan seemed to indicate that Cruz was helping appellant when Ybarra uttered her final cry, but on cross-examination, Bazan maintained that Cruz was trying to strangle him at that particular time.

here too long." Bazan lost consciousness at least twice during the robbery, once at the very end. He subsequently awoke at 7:00 or 8:00 a.m., untied himself, went to the motel manager's office, and asked the manager to call 911.

On cross-examination, Bazan testified that there was a fourth robber. He also testified, however, that he had previously expressed some uncertainty to the police on whether there was a fourth person. On redirect, he testified that he had never identified a fourth person as one of the robbers but he was sure of the three he had identified.

### 3. Detective Arnulfo Chavarria

Detective Chavarria testified as an expert on the Mexican Mafia. He talked about their practice of collecting the "dime," a ten percent tax on illegal drugs, and he identified the tattoo on appellant's chest as signifying appellant's membership in the organization.

### 4. Amalia Garcia

Amalia Garcia testified that she was present in room 20 on March 18th. She saw appellant, Cruz, and Lujan leave with bandannas and motel towels. Before they left, she heard one of them say "Let's go get her" or "Let's go get" someone, and she saw appellant ask Michelle Rodriguez for her car keys. On the morning of the 19th, Garcia was taken to the police station and questioned. When asked who rented the motel room, she made up some names because she did not want others to know she had told the police anything. Later that day, she went to George Martinez's house, where she saw appellant and also saw towel rags full of blood.

### 5. Michelle Rodriguez

In the State's case-in-chief, Michelle Rodriguez testified that appellant had rented room 20. She also testified that appellant borrowed her car keys on March 18th and that the car had not been returned by the time the police came to the motel room on the 19th. When appellant borrowed the keys, he was wearing blue jeans and a T-shirt. In the defense's case-in-chief, she testified that appellant drove with her to the hospital on the evening of March 19, 1998. A hospital record showed that they were there at 6:56 p.m. She also testified that, when she arrived at Martinez's house on the afternoon of the 19th, her car was there, but she did not see appellant, who arrived later. She also did not see any blood or injuries on appellant. She lent her car to Cruz on the 20th, and she signed a consent to search form for her car on the 21st, after Cruz had been arrested.

### 6. Police officers and medical testimony

According to several San Antonio police officers, the police were called at around 8:30 a.m. concerning the incident in question. There were socks tied around Bazan's legs, a shirt around his ankles, and a clothesline wire around his neck. DNA testing was conducted on clothes found in the trunk of Rodriguez's car. Bazan could not be excluded as a contributor to a bloody shirt and jacket found there. Appellant could not be excluded as a contributor to blood found on a pair of shorts in that same location. DNA testing under Ybarra's fingernails excluded appellant and Lujan as the source of DNA but were inconclusive as to Cruz's DNA. Medical testimony indicated that Ybarra's death resulted from strangulation by a ligature (i.e. a cord-like object).

### 7. The Motel Manager

The manager of the New Laredo Motel testified for the state regarding the days

various rooms were rented and to whom. On cross-examination, he testified that, on March 19, 1998, the people in room 16 checked out at about 7:45 a.m.

### 8. Mercedes Villarreal

Mercedes Villarreal testified for the defense as an alibi witness. She had been involved in an extramarital romantic relationship with appellant. She was reluctant to testify because she had not wanted her husband to discover the affair. According to Villarreal, appellant called her between 5:30 and 6:00 a.m. on March 19, 1998. He asked her to pick him up at the Easy Shop, a store that was half a block away from the New Laredo Motel. She picked appellant up between 6:30 and 6:45 a.m. (before taking her children to school) and took him back to her house. He was wearing jeans, tennis shoes, a T-shirt, and a cap, and she saw no injuries or blood on him. Later, she saw news of the robbery and murder on television and went back to her home, where she found appellant asleep. At around 6:00 p.m., she took appellant to the Martinez home. Villarreal also testified that she had visited appellant twice in jail since he was arrested for the crime, and she acknowledged appellant's membership in the Mexican Mafia.

### 9. Hector Galvan

Hector Galvan shared a jail pod with Cruz after Cruz had been arrested in connection with the present offense. According to Galvan, Cruz told him that appellant had nothing to do with the crime but that Cruz was trying to mislead investigators away from himself. Galvan denied being a member of the Mexican Mafia, and he denied ever signing a form acknowledging his membership. However, he did admit that TDC [7] listed him as a confirmed member. He also acknowledged that appellant is a member of the Mexican Mafia.

As a State's rebuttal witness, Detective Chavarria testified that Galvan is a member of the Mexican Mafia and that Galvan had signed a TDC form admitting that he was a member.

### 10. Dr. James Garriott, M.D.

Dr. Garriott testified for the defense about the effects of drug consumption on perception. He testified that cocaine can adversely affect perception, cause hallucinations, and cause someone to have a psychotic episode. Someone using cocaine can forget things that happened and "remember" other things that did not happen. A cocaine user can also seriously misjudge the passage of time. He also testified that marijuana and heroin use can alter a person's perception of events. On cross-examination, he conceded that, if a person injected a small amount of cocaine at 9:00 in the evening, he would not still be feeling the effects of that cocaine at 6:00 the next morning.

### 11. Jury Charge

The jury charge alleged murder in the course of robbery as the State's theory of capital murder. The "intent to promote or assist" theory of the law of parties was included in the jury charge.[8]

### B. ANALYSIS

#### 1. Sufficiency of the evidence

In point of error two, appellant challenges the sufficiency of the evidence. His

---

7. Abbreviation for Texas Department of Corrections, now known as the Texas Department of Criminal Justice–Institutional Division.

8. Texas Penal Code § 7.02(a)(2): "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

claim concerns three categories of sufficiency: accomplice witness corroboration, legal sufficiency, and factual sufficiency.

### a. *Accomplice testimony*

■ First, appellant contends that there is insufficient evidence to corroborate Cruz's accomplice witness testimony. Article 38.14 provides that a conviction cannot stand on accomplice testimony unless there is other evidence tending to connect the defendant to the offense.[9] The non-accomplice evidence need not be sufficient, in itself, to support a conviction, and the accomplice witness rule is not governed by federal or state constitutional standards.[10]

The following non-accomplice evidence tends to connect appellant to the offense:

(1) Moses Bazan testified that appellant was one of the robbers, that he was Ybarra's primary assailant, that he hit Ybarra numerous times, and that he was hitting Ybarra when she uttered her last cry before she died.

(2) Amalia Garcia testified that appellant was with Cruz and Lujan and that one of them said "Let's go get her" or "Let's go get" someone.

(3) Garcia and Michelle Rodriguez testified that appellant borrowed Rodriguez's car keys on the evening before the murder. Clothes with Bazan's blood on them were found in the trunk of Rodriguez's car.

The requirements of the accomplice witness rule were satisfied.

### b. *Legal and factual sufficiency*

■ Next, appellant contends that the evidence is legally and factually insufficient to support his conviction. In reviewing legal sufficiency, this Court looks at all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[11] In reviewing factual sufficiency, we look at all of the evidence in a neutral light, and will reverse only if the evidence supporting guilt is so obviously weak as to render the conviction clearly wrong and manifestly unjust, or if that evidence, although adequate when taken alone, is so greatly outweighed by the overwhelming weight of contrary evidence as to render the conviction clearly wrong and manifestly unjust.[12] Although a reviewing court has, in a factual sufficiency review, some authority to disregard evidence that supports the verdict, it must be appropriately deferential so as to avoid substituting its own judgment for that of the fact finder.[13] The reviewing court should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony.[14]

■ Appellant's claim is that the evidence is insufficient to establish his identity as one of the perpetrators. He bases

---

**9.** *Cathey v. State,* 992 S.W.2d 460, 462 (Tex. Crim.App.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). Article 38.14 provides: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

**10.** *Id.* at 462–463.

**11.** *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**12.** *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim.App.2000).

**13.** *Wesbrook v. State,* 29 S.W.3d 103, 112 (Tex.Crim.App.2000), *cert. denied,* 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001).

**14.** *Id.*

his claim on a number of factors, but we find none of these to be persuasive. He first contends that Bazan's identification of appellant as the assailant was questionable. Appellant challenges Bazan's credibility due to his drug use. He focuses on the fact that Bazan did not actually see appellant strangle Ybarra and that Bazan testified that Cruz helped appellant restrain Ybarra. Even if we concluded that Bazan was under the influence of cocaine at the time the assault occurred, that would not render the evidence legally insufficient. A rational jury could believe that he accurately identified appellant as one of the robbers despite the drug's influence. Even under a factual sufficiency review, the influence of an illegal drug would be but a factor to consider.[15] Moreover, the defense's own expert conceded that the effects of a small cocaine dose taken at 9:00 in the evening would not still be felt at 6:00 the following morning. If Cruz's testimony about the time of the robbery is correct, Bazan would not still be under the influence of cocaine. Even if Bazan's testimony that the robbery occurred at 3:00 in the morning is correct, a factfinder would be well within its discretion to believe that the effects of the cocaine had sufficiently worn off to enable an accurate identification.

As for appellant's claim that Bazan did not actually see appellant strangle the victim, the State did not have to prove that appellant personally killed Ybarra. The jury was charged on the law of parties, and Bazan's testimony was more than sufficient to establish appellant's guilt as a party. Even so, Bazan did testify that appellant was the only person around Ybarra when she cried out the last time before she died and that appellant was assaulting her at the time.

Second, appellant claims that Cruz was the sole witness to articulate the "el dime" motive for the crime. Appellant is incorrect. Cruz's testimony is the only direct evidence of that motive, but the testimony of several other witnesses combined gives circumstantial support for that motive. Other witnesses testified that appellant was a member of the Mexican Mafia. And Detective Chavarria testified that the Mexican Mafia collected this "el dime" from drug dealers.

Third, appellant contends that Cruz gave false and misleading testimony concerning the timeline of events. This claim appears to be a reference to Cruz's inaccurate testimony concerning the date of his arrest. Cruz did testify that he used drugs after the crime, and a defense expert did testify to the distorting effects of drugs on a person's sense of time. The factfinder was free to believe Cruz's inaccurate testimony was an honest mistake, brought on by intoxication, or by the dimming of memory through the passage of time, rather than a lie. Appellant may also be referring to conflicts between Cruz's and Bazan's testimony concerning the timing of events. Even under a factual sufficiency review, however, we generally defer to the factfinder's resolution of conflicting witness testimony.[16]

Fourth, appellant contends that he offered a credible alibi. His alibi witness was a former lover who visited appellant in jail twice after he was charged. The jury could have disbelieved her testimony, believing her to be biased. But even if the jury believed her testimony, that testimony does not preclude appellant's commission of the crime. Even if the robbery began during the 5:30 to 6:30 time frame

---

**15.** *See Cain v. State,* 958 S.W.2d 404, 409 (Tex.Crim.App.1997).

**16.** *Id.* at 408–409.

cited by Cruz (instead of at 3:00, testified to by Bazan), there would have been sufficient time for appellant to change clothes and walk to the Easy Shop, only a half-block away—although this testimony does conflict with Cruz's testimony about the events taking place after the crime.

Fifth, appellant contends that both a State's witness and the alibi witness described appellant wearing the same clothing. This claim is apparently a reference to Rodriguez's testimony that appellant wore blue jeans and a T-shirt and Mercedes's testimony that appellant wore jeans, a T-shirt, tennis shoes, and a cap. Although the rather generic "jeans and a T-shirt" testimony of each witness shows appellant wearing *similar* clothing, it does not establish that he wore the *same* clothing. Moreover, Rodriguez described appellant's clothing at the time he asked her for the keys to her car. Appellant could have put on the blue warmups described by Cruz after asking for the keys and then taken them off later. Or the jury could simply have disbelieved Mercedes' testimony.

Sixth, appellant contends that Cruz's testimony conflicts with that of other witnesses: the motel manager's testimony that the guests in room 16 did not check out until 7:45; Bazan's testimony that Lujan, not appellant, hit Bazan in the head with a weapon; and Bazan's testimony that Cruz, not appellant, stabbed Bazan in the head. Even if these statements did conflict, such conflicting testimony is of the type normally resolved by a factfinder.

Finally, appellant contends that Cruz was the only person not excluded as a donor of the DNA under the victim's fingernails. The expert testified, however, that the test of Cruz's DNA was inconclusive—Cruz was neither excluded nor included.

What we have in the present case is the testimony of two eyewitnesses who placed appellant at the scene of the crime, as a participant in the robbery, and as Ybarra's killer. A different witness testified to overhearing a conversation between appellant and his cohorts that was consistent with a planned murder. Several witnesses testified that appellant was a member of the Mexican Mafia, and there was testimony that the Mexican Mafia collected money from drug dealers, that Ybarra was a drug dealer, and that she was especially nervous or frightened the week before her murder. In the trunk of a car appellant borrowed shortly before the crime, authorities found clothing that contained appellant's blood and other clothing that contained Bazan's blood.

Appellant raises potential conflicts in the testimony of various witnesses, a biased alibi witness whose alibi is not watertight, questions regarding the timeframe for when the events occurred, questions about the honesty and reliability of the accomplice witness, questions concerning the reliability of the surviving victim's testimony, and the inconclusive DNA evidence.[17]

Having examined all the evidence in the light most favorable to the verdict, we find that a rational jury could have found appellant guilty of the crime. Moreover, after examining the evidence in a neutral light, we find that the supporting evidence

---

17. We note that, although appellant does not refer to it in his brief, he also introduced the testimony of Galvan who stated that Cruz claimed responsibility for the murder and exonerated appellant. The jury was free to believe that Galvan was a member of the Mexican Mafia and was covering for a fellow member. Considering Galvan's testimony that he never signed a form acknowledging his membership along with Chavarria's testimony that Galvan did sign such a form, the jury could believe that Galvan was a perjurer, and consequently, that his testimony could not be trusted.

is not so weak—nor is the contrary evidence so overwhelmingly strong—as to render the verdict clearly wrong and manifestly unjust. The evidence is legally and factually sufficient to support the conviction. Point of error two is overruled.

### 2. Perjured testimony

 In point of error one, appellant contends that the State used perjured testimony in violation of due process.[18] The Fourteenth Amendment prohibits the knowing use of perjured testimony by the prosecution.[19] Even when the prosecutor does not instigate the perjury, he is obligated to correct any perjured testimony given by one of his witnesses.[20]

The testimony at issue concerns the date of Cruz's arrest. At trial Cruz testified that he was arrested on March 19. Appellant claims that this testimony was a lie because Cruz was actually arrested on March 20. He further claims that the prosecutor knew that the testimony was a lie because a police officer later testified, under cross-examination, that Cruz was arrested on March 20. In closing argument, the prosecutor conceded that Cruz's testimony in this regard was inaccurate.[21]

Appellant has failed to demonstrate that Cruz lied about the date of the arrest. Under the evidence in this case, it is possible that Cruz was simply mistaken. Even if the testimony was a lie, the State cor-

rected the false testimony in its closing argument. At best, appellant's claim boils down to an argument that the State was *tardy* in correcting the false testimony. However, appellant has failed to demonstrate any prejudice from the tardiness of the correction.[22] Defense counsel was able to elicit the correct information from another State's witness and was able to use the information in closing argument not only to support his theory of the case, but also to attack Cruz's credibility. Point of error one is overruled.

### 3. "Mexican Mafia" evidence

 In point of error three, appellant contends that the trial court erred in admitting evidence of appellant's affiliation with the Mexican Mafia. He cites Rules 401, 402, 403, 404(a), 608, 609, and 702.[23] He does not explain how Rules 608, 609, and 702 were violated by the evidence in this case, so we will not address those rules. As for Rules 401, 402, and 404, we hold that gang-affiliation is relevant to show a motive for a gang-related crime. In *Medina v. State*, we held that extraneous offenses committed by a gang at a particular home were relevant to show that the home was a target of the gang, and therefore, that the defendant, who was a member of the gang, had a motive to commit the offense.[24] In the present case,

---

18. *See* United States Constitution, Fourteenth Amendment, § 1, Cl. 3: "nor shall any State deprive any person of life, liberty, or property, without due process of law."

19. *United States v. Bagley*, 473 U.S. 667, 678–679, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A due process violation is established if the prosecutor knowingly uses perjured testimony and the reviewing court cannot determine beyond a reasonable doubt that the testimony was harmless. *Id.* at 679 n. 9.

20. *Id.* at 678; *Ex Parte Castellano*, 863 S.W.2d 476, 480 (Tex.Crim.App.1993).

21. *See* fn. 4, *ante.*

22. *See Little v. State*, 991 S.W.2d 864, 867 (Tex.Crim.App.1999).

23. All references to rules are to the Texas Rules of Evidence unless otherwise indicated.

24. *Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim.App.1999), *cert denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). Although we declined to address the Rule 404(b) issue in *Medina* because it was unpreserved, the discussion of relevance to appel-

the connection was even more direct: the evidence in question was appellant's affiliation with the gang, and that evidence was used to show a motive for an allegedly gang-related crime.

■ Appellant cites *Medina* and appears to concede that the evidence is relevant; however, he claims a violation of Rule 403. But this claim is unavailing. To violate Rule 403, it is not enough that the evidence is "prejudicial"—it must be *unfairly* prejudicial.[25] Unfair prejudice occurs when the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[26] The potential improper basis would be the use of gang affiliation to show that appellant was a bad person and that he acted in conformity with his bad character. However, the trial court did not err in finding that this potential character conformity inference does not substantially outweigh the relevant purpose of showing motive for the robbery and murder. Point of error three is overruled.

### 4. Motion for continuance

■ In point of error four, appellant contends that the trial court erred in denying his motion for continuance. On October 25, 1999, after the parties qualified nine jurors on individual voir dire, the State informed the defense that Cruz would be testifying for the State at appellant's trial. The State said that it would provide appellant with Cruz's revised statement and the terms of the plea agreement between the State and Cruz. At defense counsel's request, the State orally informed counsel of the terms of the agreement. That same day, defense counsel filed a motion for continuance. The motion was denied, and trial began on November 2, 1999. The record also reflects that defense counsel was aware before voir dire began that the State was attempting to secure Cruz's cooperation.

■ The trial court's ruling on a motion for continuance is reviewed for abuse of discretion.[27] To establish an abuse of discretion, the defendant must show that he was actually prejudiced by the denial of his motion.[28] Appellant points to three prejudicial effects of the trial court's failure to grant a continuance: (1) defense counsel was unable to voir dire three-fourths of the jurors on the accomplice witness rule, (2) defense counsel was surprised by the introduction of a new theory of the case—the Mexican Mafia motive, and (3) Cruz's credibility was crucial to the State's case.

Defense counsel should have anticipated the possibility that Cruz could become a witness, as it is not uncommon for a co-defendant to turn State's evidence for a favorable deal. Moreover, appellant's counsel was aware before voir dire that the State was attempting to procure Cruz's testimony, and so the astute trial judge was correct in observing that it was defense counsel's decision to refrain from

---

lant's motive applies equally in the Rule 404(b) context. *See* Rule 404(b)("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive. . . .").

**25.** *Rogers v. State,* 991 S.W.2d 263, 266 (Tex. Crim.App.1999).

**26.** *Id.* (quoting *Cohn v. State,* 849 S.W.2d 817, 820 (Tex.Crim.App.1993)(citing 1 Steven Goode et al, Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal § 403.2, at 93 (2d ed.1993))).

**27.** *Janecka v. State,* 937 S.W.2d 456, 468 (Tex. Crim.App.1996).

**28.** *Id.*

voir dire on the accomplice witness rule. In addition, from the time the State made its announcement, the defense still had eight days—including a weekend—to prepare for this testimony. And the defense was able to procure witnesses to counter Cruz's testimony, including: Galvan's testimony that Cruz admitted his own guilt while exonerating appellant, evidence that Cruz gave the wrong date of arrest, and inconsistencies between some of the details given by Cruz and those given by Bazan, Rodriguez, and Mercedes. Appellant does not show that he was unable to procure a helpful witness who would have countered some aspect of Cruz's testimony that he could have procured had he been granted a continuance. Finally, the State was able to connect appellant to the Mexican Mafia through the testimony of Detective Chavarria, who identified appellant as a member from his tattoo. Appellant has failed to show that he was prejudiced by the trial court's ruling. Point of error four is overruled.

The judgment of the trial court is affirmed.

JOHNSON, J. concurred in the result.

HERVEY, J. did not participate.