# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00270-CR

**Robert Henry Smith, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT NO. CR2008-491, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Robert Henry Smith guilty of murder. *See* Tex. Penal Code Ann. § 19.02(b) (West 2003). The jury assessed punishment at thirty years' imprisonment and imposed a $6,000 fine. In three issues, Smith argues that: (1) the evidence is factually insufficient to support his conviction; (2) the evidence is legally insufficient to establish the finality of one of the convictions used for enhancement of his sentence; and (3) the trial court erred in imposing a fine when one was not authorized by statute. We overrule Smith's first and second issues challenging the sufficiency of the evidence, but we sustain his third issue challenging the imposition of the $6,000 fine. Accordingly, we modify the trial court's judgment to delete the fine and affirm the judgment as modified.

# BACKGROUND

On the evening of July 11, 2008, Nancy Shields used her cell phone to call 9-1-1 from her home in Comal County.[1] During the call, she stated that she needed help and that her boyfriend was trying to burn her, hurt her, and take her car. When asked what her boyfriend was doing at that moment, she said that he was grabbing her and would not let her go. She then yelled, "he's stabbing me" several times before she apparently dropped the phone. At that point, she could be heard shouting at her boyfriend, Smith, stating "this is what you did to me." The phone call ended a short time later.

Nineteen seconds after the call ended, Smith called 9-1-1 from a landline phone in the home. Smith stated that Shields stabbed herself in the stomach with a knife. He also stated, "I'll go to jail." In the background, Shields can be heard shouting various things at Smith, including "you stabbed me," "look at what you've done to me," and "this is your fault."

At a later point in the call, Smith stated to Shields, "Come on, hit me again." Smith also stated to the 9-1-1 operator, "I tried taking the knife away, and I got cut." When asked by the 9-1-1 operator if he and Shields were intoxicated, Smith said that they both had been drinking alcohol. Smith stated, "I'll go to jail for it, but you can run DNA on it." When asked what Shields was doing at that moment, Smith stated that she was sitting down and saying that "it was all [his] fault." Throughout this part of the call, Shields can be heard in the background shouting various things at Smith.

---

[1] All of the factual background regarding what occurred in this case is derived from the testimony and exhibits admitted at trial.

2

Eventually, Smith stated that Shields was standing up and walking back toward the kitchen and toward her bedroom.  He also stated that Shields was "bleeding bad" and that they "needed EMS immediately."  A short time later, Smith said that Shields laid down "like she [was] losing energy" and that she was breathing heavily.  When asked where Shields was located in the home, Smith said she was "laying right in the door" and that she was telling him that she hated him and saying good-bye.  When asked if Shields was still conscious, Smith indicated that she was "barely" conscious.  He stated that he was "kicking her in the legs."  When the 9-1-1 operator told him not to kick her, Smith stated that he was "pushing her legs."  He can then be heard shouting "Nancy" at Shields and then stating to the 9-1-1 operator that Shields was unconscious and that he needed EMS immediately.  Smith hung up the phone when EMS arrived a short time later.

Deputy Martin Escarzaga and a constable were the first to arrive at the scene.  EMS personnel had also arrived outside the home but were waiting for the scene to be secured before entering.  Escarzaga and the constable ordered Smith out onto the front porch, and Escarzaga handcuffed Smith and placed him in the back of a patrol car.  EMS personnel then immediately entered the home and began treating Shields.  Meanwhile, Escarzaga entered the home and found a kitchen knife on the floor to the right of the front door.  The knife was behind a chair and somewhat concealed by a curtain.  Escarzaga took the knife into evidence.  He testified that in addition to observing the knife, he also noticed that some items had been "thrown around" inside the home.

When Paramedic Robert Campbell arrived at the scene with another paramedic, he found Shields lying on her stomach surrounded by several puddles of blood at the front door of the home.  Campbell turned Shields over.  He testified that her shirt was open and that he could see a

3

laceration under her right breast. Shields had a very weak pulse and was in and out of consciousness. Campbell called a dispatcher and requested a helicopter to transport Shields. At one point while the paramedics were treating her and preparing her for transport, Shields stated, "he got my leg." As a result, Campbell cut off Shields's pants on her left leg and found a laceration on the outside of her upper thigh. Campbell also observed lacerations on Shields's forearms and testified that the lacerations looked like defensive-type wounds. A helicopter eventually arrived and transported Shields to a hospital, where she later died.

Detective Vance Weltner arrived at Shields's home after paramedics had taken her from the home. He and another detective spoke with Smith outside the home. Smith had a bite mark on his chest, and he told Weltner that Shields had bitten him. Smith also had a scratch or laceration on his chest. In addition, Weltner observed a cut on Smith's right hand, which he testified could be consistent with a defensive wound. Weltner also noticed blood on Smith's clothing and testified that he found it suspicious that Smith gave different accounts of how the blood got there.

After speaking with Smith, Weltner and the other detective went inside the home. Weltner observed blood, broken items, and bloody clothing in the home and testified that the scene appeared consistent with other violent scenes he had observed. He collected considerable evidence at the scene, including a landline phone; Smith's DNA; swabs of blood taken from Smith's right hand, left pinky finger, left forearm, and right elbow; the jeans, shirt, and boots worn by Smith; and swabs of blood from the living-room carpet, the butcher block in the kitchen, and the kitchen floor. He also took several photos, including photos of Smith; Smith's right hand, chest, jeans, and boots; the kitchen; the kitchen countertop; and the living room. He explained that the photos of Smith showed a bite-mark on Smith's chest and blood on his jeans, right hand, and boots. The photos of

4

the home showed trails of blood on the kitchen floor leading toward the living room and bedroom; blood on the side of the kitchen countertop; a broken porcelain chicken and an overturned walker and fan on the kitchen floor; and blood on the landline phone, which was on the living-room floor.

At some point, the detectives removed Smith's handcuffs and allowed him to go back inside the home to show them what had happened when the stabbing occurred. An investigator videotaped the scene while Smith and the detectives were in the home. In the video, one of the detectives can be seen collecting swabs of blood from several places on the kitchen floor. The detective also collected swabs of the inside of Smith's mouth.

Also during the video, Smith explained how the stabbing allegedly occurred, stating that Shields grabbed one of the kitchen knives from a knife set and stabbed herself in the abdomen while standing in the kitchen. Smith then demonstrated how Shields allegedly walked through the kitchen, bleeding, before falling to the floor near the living room. He stated that he called 9-1-1 immediately after Shields stabbed herself. He stated that after Shields fell, he "put her up there" while he was still on the phone. He then explained that the 9-1-1 operator told him to get away from Shields, and he did so. He stated that the 9-1-1 operator asked him whether Shields was conscious and that he responded that he did not know and then started "pushing on her leg." As he spoke, he demonstrated how he had pushed her leg with his right foot to check for responsiveness. He explained that he did not remember or did not know how certain overturned items in the house got tipped over or how a metronome had become lodged in one of the walls.

When asked about the 9-1-1 calls, Smith explained that Shields called 9-1-1 on a cell phone before the stabbing occurred. He stated that Shields eventually hung up the cell phone and "then [he] had it." He stated that he then called 9-1-1 using the landline phone. Regarding the

5

content of Shields's 9-1-1 call, Smith stated that he did not know what Shields said during the call because he was "going outside" and "trying to leave." When one of the detectives pointed out that Smith had previously stated that Shields told the 9-1-1 operator that Smith was trying to burn her, Smith stated that Shields "was standing there with a damn lighter to her arm, saying that I'm burning her. And I ain't burning her. I ain't touching her." When asked how blood got on the landline phone, he stated that it happened when Shields dropped to the floor and he "had her there," and that he got blood on him while he was still on the phone with the 9-1-1 operator. At the end of the video, one of the detectives stated, "I'm going to ask you straight out, did you stab her?" Smith responded, "No sir, I didn't. And that's the truth." The detectives did not arrest Smith that night.[2]

After Shields's death, Medical Examiner Randall Frost conducted an autopsy of her body. Frost observed three stab wounds. He testified that all of the wounds were consistent with the kitchen knife found at the scene. One of the stab wounds was in the abdomen and punctured the liver. Frost testified that the wound indicated that the knife entered the body at a forty-five degree angle and that the sharp end of the knife had been pointing upward and outward. Frost identified a second stab wound on the outside of Shields's right thigh. He testified that the wound was approximately five inches deep. The wound had a vertical orientation and indicated that the blunt end of the knife had formed the bottom of the wound while the sharp end of the knife had formed the top of the wound. Frost observed the third stab wound on the front of Shields's left forearm. He testified that the wound was approximately two or three inches in depth and that there was a possibility that the wound could have been a defensive wound. He further testified that all of the

---

[2] The record does not indicate how much time passed before Smith was arrested.

stab wounds could have been self-inflicted. However, he noted that the forearm wound was in an unusual location for a self-inflicted wound.

Frost also observed other injuries on Shields's body, including an abrasion underneath her breast, a cluster of abrasions on her right-flank area, several abrasions and scratches near the stab wound in her forearm, scratches on the knuckle of her right index finger, a bruise on the back of her right hand, a group of bruises on her upper left arm, a bruise on her left hand, a large bruise on the inside of her upper right arm, two bruises on her right forearm, a bruise on the outside of her right forearm, and a small bruise on the front of her right leg.

Frost testified that the cause of Shields's death was the stab wound to her abdomen because the wound punctured the liver, causing extensive bleeding. Frost ultimately classified Shields's death as a homicide. He also testified that at the time of Shields's autopsy, she had a blood-alcohol level that was slightly below the legal limit for operating a motor vehicle in Texas.

Mark Wild, a latent fingerprint examiner for the Texas Department of Public Safety ("DPS"), analyzed the kitchen knife used in the stabbing and testified that there were no latent fingerprints on the knife. Kimberly Clement, a forensic scientist for DPS, compared Shields's and Smith's DNA to DNA evidence collected at the scene of the stabbing and testified that Shield's DNA was the only DNA found in the blood on the kitchen knife used in the stabbing, the blood on the kitchen floor, and the blood on the side of the countertop in the kitchen. Shields's DNA was also found in the blood on Smith's left pinky finger, right elbow, right boot, and jeans. In the blood on Smith's left forearm and in a saliva stain on Smith's t-shirt, Clement identified a mixture of Smith's and Shields's DNA. She testified that Smith's DNA was found in the blood on Smith's right palm, one of the bloodstains on Smith's t-shirt, and the blood on the landline phone.

7

Both the State and Smith called experts to testify regarding their analyses of the crime-scene evidence. The State's expert, Lieutenant Rick Pippins, testified extensively about his interpretation of the blood evidence and concluded that Smith stabbed Shields while the two of them were involved in a close-combat situation. He testified that one of the bloodstains on Smith's jeans was transferred directly from a blood source and took on the shape of a blood-flow pattern. Pippins testified that another bloodstain on Smith's jeans was so small that it indicated that it was deposited there by some type of force.

Pippins further testified that one of the bloodstains on Smith's right boot was not a naturally occurring drop and was caused by some type of impact or force associated with blunt-force trauma or stabbing incidents. Because the bloodstain was identified as consistent with Shields's DNA, Pippins concluded that Smith had to have been within a few feet of Shields when the blood-causing injury was inflicted. Pippins also testified that the bloodstain on Smith's left pinky finger that was identified as consistent with Shield's DNA also had to have been transferred while Smith was in close contact with Shields.

Pippins examined photographs of Smith's right hand and observed a cut on Smith's thumb, blood on his thumb and hand, and areas that were void of blood on his palm. Given that the blood on Smith's right hand matched Smith's DNA, Pippins concluded that the knife likely slipped in Smith's right hand as he stabbed Shields, causing a cut on his right hand.

Smith called Louis Akin, a crime-scene analyst, to testify regarding the significance of the crime-scene evidence. Akin concluded that all of the evidence was consistent with a scenario in which Shields stabbed herself. He testified that the bloodstain pattern in the kitchen indicated that the stabbing occurred in a corner of the kitchen near the stove and that the absence of any sign of a

8

struggle—no blood smears, overturned items, or displaced throw rugs—at that location indicated the stabbing was self-inflicted.[3] He also testified that the bloodstains starting at the location near the stove and trailing across the kitchen in a straight line indicated the absence of a struggle because Shields would not have walked in a straight line if she had been involved in a struggle with Smith. Akin also testified that the general lack of footprints or smears in the bloodstains indicated that there was not a violent struggle taking place. In addition, Akin testified that he would expect to see more impact blood—blood that is "thrown off" or "exploded out" of the body before it impacts a surface—and more transfer blood—blood that is transferred to an object when something bloody touches the object—if there had been a struggle. Akin further testified that a space that was void of blood on Shields's right palm could have been caused by Shields holding the knife in her right hand.

In addition to evidence from the night of the stabbing, Smith also offered evidence regarding two previous domestic disputes between him and Shields. Officer Christopher Vargas responded to the first domestic dispute, which occurred in April 2008. Vargas testified that he observed that Shields was upset and exhibiting aggressive behavior when he arrived at the home, including throwing beer cans while she was outside in the yard. Vargas observed that Smith had bite marks on his body and blood on his arms. Shields had some injuries on her body that Vargas determined may have occurred when Shields was biting Smith. Ultimately, Vargas concluded that Shields was the primary aggressor in the dispute and arrested her for assault. Smith signed a non-prosecution affidavit, but Vargas still took Shields to jail.

---

[3] The State's expert, Rick Pippins, also concluded that the initial stabbing occurred in the corner of the kitchen near the stove.

Vargas testified that Shields was upset, angry, and emotional on the way to jail. She used obscenities and was "pretty belligerent." At one point, she talked about suicide and asked Vargas to kill her. She also rolled down the window next to her while he was driving and attempted to climb out the window. As a result, Vargas stopped the car and secured Shields and the windows before continuing to the jail.

Shields was booked into the jail by Corrections Corporal Shawn Cunningham. When Cunningham interviewed Shields, Shields stated that she was depressed, that she had thought about killing herself that day, and that she had attempted suicide the previous week. Cunningham testified that Shields appeared depressed, hopeless, and sad. Shields was placed on "suicide watch," during which she was checked every fifteen minutes while she was in jail to ensure she was not attempting to harm herself.

The second previous domestic dispute between Smith and Shields occurred in June 2008. Officer Julie Prescott responded to a call for assistance from Shields's home and arrived to find Shields on the front porch and Smith outside next to a car in the driveway. Prescott noticed that Shields appeared angry and upset. Smith approached Prescott and showed her a burn mark on his left forearm. He explained that Shields had pressed a lit cigarette against his arm to try to get the car keys away from him. Shields confirmed that she had done so. Prescott observed that both Smith and Shields appeared intoxicated. Prescott arrested Shields for family violence. Shields was upset and crying at the time of her arrest.

When Prescott and Shields arrived at the jail, Officer Daniel Nichols booked Shields into the jail. During Nichols's interview of Shields, Shields stated that she was depressed, that she

had thought of committing suicide the previous day, and that she had attempted suicide several years earlier after a miscarriage.

As further evidence of Shields's mental state, Smith called Dr. Gerlyn Friesenhahn—a neurologist who treated Shields from November 2005 to July 2007—to testify at trial. Friesenhahn testified that Shields had been diagnosed with a condition called chronic inflammatory demyelinating polyneuropathy, a debilitating disease, and that Friesenhahn had prescribed a medication called Neurontin for nerve pain. Friesenhahn also testified that by the time of Shields's last visit, Shields was experiencing anxiety and depression and that Friesenhahn prescribed a medication called Paxil as treatment. According to Friesenhahn, the consumption of alcohol could have worsened Shields's depression. Friesenhahn also testified that Shields never indicated to her that she had suicidal thoughts.

The State offered two 9-1-1 calls—one from a neighbor and one from Smith—regarding another domestic dispute between Shields and Smith that occurred at some point prior to the night of the stabbing.[4] In the 9-1-1 call from Shields's neighbor, the neighbor stated that Smith was drunk, yelling at Shields, and refusing to leave the property. The neighbor stated that Shields had asked Smith "over and over again" to leave but he would not leave. The neighbor further stated that she had been standing between them trying to "keep the peace" and that Smith had lunged at Shields. She also stated that she and Shields had finally gotten Smith out of the house and locked the door. At the end of the call, she indicated that Smith had just called 9-1-1 on another phone.

---

[4] The exhibit volume in the record provides an incorrect date for one of the 9-1-1 calls (as evidenced by the fact that the date was after Shields's death) and provides no date for the other call, and none of the evidence in the record otherwise indicates the date of the calls.

11

The second 9-1-1 call offered by the State was the call from Smith that was placed during the same incident. In the call, Smith stated that he and Shields were in "another dispute," and that the dispute arose because Shields and the neighbor said that he would not leave the property. He stated that Shields had just locked him out of the house. Smith further stated that he and Shields had both been drinking. At the end of the call, he stated that he would leave the property and go across the street.

After hearing all the evidence, the jury began deliberations. On the third day of deliberations, the jury indicated that it was deadlocked, and the trial court gave the jury an *Allen* charge.[5] On the fourth day of deliberations, the jury reached a verdict and found Smith guilty of murder. At the punishment hearing, Smith pled true to two enhancement allegations, one involving a felony conviction for possession of a forged check in 1994 and the other involving a felony conviction for making false statements to a federal firearms licensee in 1999. Smith also formally stipulated that the enhancement allegations were true and that the penitentiary packets for each of the previous convictions were admissible. The jury found that both of the enhancement allegations were true and assessed punishment at thirty years' imprisonment and a $6,000 fine.[6] This appeal followed.

---

[5] An *Allen* charge reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve. *See Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)).

[6] The range of punishment was twenty-five to ninety-nine years. *See* Tex. Penal Code Ann. §12.42(d) (West Supp. 2009).

**DISCUSSION**

On appeal, Smith contends that: (1) the evidence is factually insufficient to support his conviction; (2) the evidence is legally insufficient to establish the finality of the first enhancement conviction; and (3) the trial court erred in imposing a fine when one was not authorized by statute. We address each issue below.

*Factual Sufficiency of Evidence Supporting Conviction*

In his first issue, Smith argues that the evidence is factually insufficient to support his conviction because the evidence that Smith stabbed Shields was greatly outweighed by the evidence that Shields stabbed herself. In reviewing the factual sufficiency of the evidence, we must weigh all the evidence in a neutral light and set the finding aside only if the evidence is so weak that the verdict seems clearly wrong or manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). An appellate court must be appropriately deferential to the jury's verdict in order to avoid substituting its own judgment for that of the factfinder. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Id*.

Here, the record includes a considerable amount of directly conflicting evidence. To begin with, the 9-1-1 calls on the night of the stabbing and the videotape of Smith at the crime scene contain conflicting statements provided by Shields and Smith. During Shields's 9-1-1 call, she stated that Smith was trying to burn her, hurt her, and take her car, and she yelled, "he's stabbing me" several times. In addition, during Smith's 9-1-1 call, Shields could be heard shouting various

13

things at Smith, including "you stabbed me," "look at what you've done to me," and "this is your fault." When paramedics were later treating Shields, Shields stated, "he got my leg." Paramedics removed Shields's pants and found a laceration on the outside of her upper thigh.

In contrast to Shields's statements, Smith's statements in his 9-1-1 call and the videotape of him at the crime scene indicate that Shields stabbed herself. Specifically, in his call to 9-1-1, Smith stated that Shields stabbed herself in the stomach with a knife. He also stated: "I'll go to jail for it, but you can run DNA on it." Later, after paramedics had removed Shields from the home and detectives were speaking with Smith on videotape as they examined the scene, Smith stated that Shields grabbed one of the kitchen knives from a knife set and stabbed herself in the abdomen while standing in the kitchen. At the end of the video, one of the detectives said, "I'm going to ask you straight out, did you stab her?" Smith responded, "No sir, I didn't. And that's the truth."

Another example of directly conflicting evidence is the expert opinions of Lieutenant Rick Pippins, who testified that the crime-scene evidence indicated that Smith stabbed Shields, and Louis Akins, who testified that the crime-scene evidence indicated that Shields stabbed herself. Pippins testified that a bloodstain on Smith's jeans and one on Smith's right boot were not naturally occurring drops and were deposited with some type of force. The bloodstain on Smith's right boot was identified as containing Shields's DNA, and Pippins determined that Smith had to have been within a few feet of Shields when the drop impacted his boot with force. In addition, Pippins testified that one of the bloodstains on Smith's jeans was transferred directly from a blood source

14

and took on the shape of a blood-flow pattern.[7] Pippins also testified that a bloodstain on Smith's left pinky finger that was identified as consistent with Shield's DNA also had to have occurred while Smith was in close contact with Shields. Given the photographs showing blood on Smith's right hand and the evidence that the blood matched Smith's DNA, Pippins concluded that the knife used in the stabbing likely slipped in Smith's right hand as he stabbed Shields, causing a cut on his right hand.[8]

The expert called by the defense, Louis Akin, testified that all of the evidence was consistent with a scenario in which Shields stabbed herself. Akin testified that the area in the kitchen where the stabbing initially occurred showed no signs of a struggle. Specifically, he noted that the throw rugs in the area were not displaced and that there were no blood smears or overturned items

---

[7] Smith argues that Pippins's opinion regarding the blood on Smith's clothing is undermined by the possibility that the clothing could have become blood-stained when Detective Vance Weltner later asked Smith to remove his clothing while Smith was still inside the home. Weltner testified that Smith removed his shirt and boots in the living room and his jeans in the bedroom. Smith asserts that the blood throughout the home could have been transferred to Smith's clothing when he removed it. However, Smith already conceded in another argument that there was no blood in the bedroom, where Smith removed his jeans. In addition, Weltner testified that Smith was not around any blood when he removed his clothing. Further, Pippins testified that a bloodstain on Smith's jeans and one on Smith's right boot were deposited with some type of force and that Smith had to have been within a few feet of Shields when the drop on his boot, which was identified as Shields's blood, impacted his boot with force. Pippins also testified that the other bloodstain on Smith's jeans was transferred directly from a blood source. Because there is evidence that the blood on Smith's clothing impacted it with force or was transferred directly from a blood source, and because there is no evidence that Smith's clothing was contaminated while Smith removed it, we reject Smith's argument.

[8] Smith contends that Pippins's determination that Smith likely cut his hand while stabbing Shields is undermined by evidence that Shields's DNA was the only DNA found on the knife. However, Smith does not deny that his hand was cut by the knife. In his brief, he states that during his 9-1-1 call, he "indicated his hand was cut when he tried to take the knife away from [Shields]." In either case, the absence of his DNA on the knife is simply one of many facts to consider in the factual-sufficiency analysis.

15

in the area. He also noted that the blood drops that trailed from the area where the initial stabbing occurred to the opposite side of the kitchen were in a straight line, which he stated was inconsistent with movement associated with a struggle. Akin also testified that the general lack of footprints or smears in the bloodstains indicated that there was not a violent struggle taking place. In addition, Akin testified that a violent struggle would have resulted in more blood impacting surfaces with force and more blood being transferred from one surface to another. Akin further testified that a space that was void of blood on Shields's right palm could indicate that Shields had held the knife in her right hand, thus blocking the blood from that area.

Up to this point in the evidence, a decision about whether Smith stabbed Shields or Shields stabbed herself could be made only after judging the credibility of the witnesses and deciding the weight to be accorded their testimony. As we have previously stated, both of these determinations rest solely with the jury.[9] *See Vasquez*, 67 S.W.3d at 236.

---

[9] In his brief, Smith asserts that his expert, Louis Akins, had better credentials than the State's expert, Rick Pippins. However, this is an issue that goes to the credibility of the experts and the weight to be accorded their testimony, which is to be determined solely by the jury. *See Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The same is true for another argument asserted by Smith—that Shields's claim in her 9-1-1 call that Smith stabbed her was unreliable because there was no blood in the bedroom where her cell phone was found and because she did not scream or make other sounds of pain during the call. Any analysis of Shields's demeanor in her 9-1-1 call goes to her credibility and the weight to be given her statements, an issue to be decided by the jury. *See id*. Further, it is unclear from the record whether Shields was in the bedroom at any point during the 9-1-1 call. Rather, the record establishes only that she called from her cell phone and that the cell phone was later discovered in the bedroom. In addition, in a videotape filmed at the crime scene after Shields was removed from the home, Smith stated to a detective that Shields called 9-1-1 on a cell phone before the stabbing occurred, that she eventually hung up the cell phone, and that "then [he] had it." Thus, jurors could have reasonably concluded that Smith took or threw the phone into the bedroom at some point after Shields ended her 9-1-1 call.

16

The remaining evidence offered by Smith includes evidence of two previous domestic disputes between Shields and Smith and evidence of Shields's history of depression, suicidal thoughts, and suicide attempts. Specifically, regarding the previous domestic disputes, police officers testified that they were called to Shields's home on two separate occasions to address disputes between Shields and Smith, and on both occasions, they arrived to find Shields in an aggressive, agitated state. On the first occasion, Officer Christopher Vargas observed that Smith had bite marks on his body and blood on his arms. Vargas concluded that Shields was the primary aggressor in the dispute and arrested her for assault. On the second occasion, Officer Julie Prescott observed a burn mark on Smith's left forearm. Smith explained to Prescott that Shields had pressed a lit cigarette against his arm to try to get the car keys away from him, and Shields confirmed that she had done so. Prescott arrested Shields for family violence.

Regarding Shields's history of depression, suicidal thoughts, and suicide attempts, Smith offered evidence of Shields's behavior after her two arrests and testimony from Shields's neurologist. For example, Officer Vargas testified that Shields was upset and belligerent as she rode in the back of his patrol car after her arrest. During the ride, she talked about suicide and asked Vargas to kill her, and she rolled down the window and attempted to climb out the window while he was driving. Corrections Corporal Shawn Cunningham testified that when Shields was booked into the jail, she stated that she was depressed, that she had thought about killing herself that day, and that she had attempted suicide the previous week. Cunningham testified that Shields appeared depressed, hopeless, and sad. Shields was placed on "suicide watch." Similarly, when Shields was booked into jail after her second arrest, she stated that she was depressed, that she had thought of

17

committing suicide the previous day, and that she had attempted suicide several years earlier after a miscarriage. Further, Dr. Gerlyn Friesenhahn, Shield's neurologist from November 2005 to July 2007, testified that Shields was suffering from a debilitating disease as well as anxiety and depression and that she was taking Neurontin for nerve pain and Paxil for her anxiety and depression. According to Friesenhahn, the consumption of alcohol could have worsened Shields's depression.

Additional remaining evidence includes the testimony of Medical Examiner Randall Frost, who conducted an autopsy of Shield's body. Frost testified that at the time of the autopsy, Shields had a blood-alcohol level that was slightly below the legal limit for operating a motor vehicle in Texas. Frost also testified that after conducting the autopsy, he determined that Shields's death was a homicide.

Considering all of the evidence supporting a conclusion that Smith stabbed Shields—including statements Shields made in her and Smith's 9-1-1 calls; the testimony of Paramedic Robert Campbell that Shields stated, "he got my leg"; the testimony of Lieutenant Rick Pippins; and the testimony of Medical Examiner Randall Frost—and all of the evidence supporting a conclusion that Shields stabbed herself—including statements Smith made during his 9-1-1 call and after the stabbing; the testimony of Crime-Scene Analyst Louis Akin; and the testimony of police officers and Shields's neurologist regarding Shields's history of mental instability and violence against Smith—we conclude that Smith's conviction is not clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15.

Although the evidence of Shields's mental instability and aggressive behavior is considerable, the evidence of what occurred on the night in question—the ultimate determination in this case—is also considerable and cannot be decided without determinations of the credibility of the witnesses and the weight to be accorded their testimony. Such determinations fall solely within the jury's purview, and we must be appropriately deferential to the jury's verdict. *See Vasquez*, 67 S.W.3d at 236. To do otherwise here, where there is a substantial amount of evidence of Smith's guilt, would be to substitute our own judgment for that of the jury, which we may not do. *See id*. "Although an appellate court's factual sufficiency review of the evidence allows the court to second-guess the jury to a limited degree, the review should still be deferential to the jury's verdict." *Williams v. State*, 301 S.W.3d 675, 685 (Tex. Crim. App. 2009) (citing *Roberts v. State*, 200 S.W.3d 521, 524 (Tex. 2007)). Because Smith's conviction was not against the great weight and preponderance of the evidence, we overrule Smith's first issue. *See Watson*, 204 S.W.3d at 414-15.

### Finality of Conviction Used for Enhancement

In his second issue, Smith contends that the evidence is legally insufficient to prove the finality of the first conviction that was used for enhancement of his sentence. During the sentencing hearing, Smith pled true to two enhancement allegations, one regarding a conviction for possession of a forged check in 1994 and the other regarding a conviction for making false statements to a federal firearms licensee in 1999. Smith did not object to the admission of a penitentiary packet for each of the previous convictions. In fact, he stipulated to the two previous convictions and to the admissibility of the two penitentiary packets in a signed Stipulation of Evidence that was admitted into evidence at the hearing.

19

Smith challenges the finality of his 1994 conviction for possession of a forged check. The penitentiary packet for the conviction shows that Smith pled guilty to the offense, that he was sentenced to a term of six years in prison, and that he was "fully advised . . . as to the law regarding the filing of Motions for New Trial, Motions in Arrest of Judgment, and Notice of Appeal." At the bottom of the judgment in the case, a notation states: "Notice of Appeal: DENIED."

As a general rule, the State must prove the finality of a conviction before the conviction can be used for enhancement purposes. *See Fletcher v. State*, 214 S.W.3d 5, 8 (Tex. Crim. App. 2007); *Harvey v. State*, 611 S.W.2d 108, 111 (Tex. Crim. App. 1981). However, if a defendant pleads "true" to the enhancement paragraph, the State's burden of proof is satisfied, and the defendant cannot complain on appeal that the evidence is insufficient to support the enhancement. *See Harvey*, 611 S.W.2d at 111; *Lugo v. State*, 299 S.W.3d 445, 455-56 (Tex. App.—Fort Worth 2009, pet. ref'd); *Magic v. State*, 217 S.W.3d 66, 70 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Smith concedes that he would generally have forfeited his right to appeal the sufficiency of the evidence to support the enhancement allegation because he pled "true" to the allegation, but he asserts that this case falls within an exception to the general rule that occurs when the record affirmatively reflects that the enhancement is improper. *See Ex parte Rich*, 194 S.W.3d 508, 513 (Tex. Crim. App. 2006); *Sanders v. State*, 785 S.W.2d 445, 448 (Tex. App.—San Antonio 1990, no pet.). The San Antonio court applied the exception in *Sanders* when the record showed that a previous conviction for delivery of marijuana was used to enhance the sentence for a subsequent conviction for possession of amphetamine even though the first conviction was not final,

20

as evidenced by the fact that the defendant's probation was revoked and he was sentenced for the previous conviction *after* the previous conviction had already been used to enhance the subsequent conviction. 785 S.W.2d at 448. There, the record clearly demonstrated that the previous conviction was not final at the time of sentencing for the subsequent conviction.

Here, Smith argues that because the judgment in the 1994 case indicates that he filed a notice of appeal, the record affirmatively reflects that the conviction was not final. We agree with Smith that a conviction that has been appealed is not considered final until it is affirmed by the appellate court and the appellate court's mandate becomes final. *See Fletcher*, 214 S.W.3d at 6 (quoting *Jones v. State*, 711 S.W.2d 634, 636 (Tex. Crim. App. 1986)). However, we disagree that the 1994 judgment in this case demonstrates that the conviction was appealed.

Although the judgment could indicate that Smith filed a notice of appeal, it also indicates that any notice of appeal was denied.[10] Smith acknowledges that he was not entitled to appeal on every issue after a plea bargain, but he argues that the denial of his notice of appeal was improper because he was entitled to appeal jurisdictional issues and pretrial rulings. Thus, he argues, because he was entitled to file a notice of appeal on some issues and was denied that opportunity, the conviction was not final. However, regardless of whether Smith was entitled to file a notice of appeal or did in fact file one, the face of the judgment shows that any notice of appeal was denied by the trial court, thus rendering the conviction final. *See Jones v. State*, 77 S.W.3d 819, 824 (Tex. Crim. App. 2002) ("The right to take an appeal does not equal the pendency of an appeal.")

---

[10] We state that the judgment "could indicate" that Smith filed a notice of appeal because the record does not clarify what the trial court's notation meant. The trial court could have intended to state only that Smith could not appeal his conviction after a plea bargain. *See* Tex. R. App. P. 25.2(a)(2).

Accordingly, the record affirmatively reflects that Smith's 1994 conviction was final, and Smith therefore forfeited his right to appeal the sufficiency of the evidence supporting the finality of the conviction when he pled "true" to the allegation.

Even if Smith had not forfeited his right to challenge the sufficiency of the evidence supporting the finality of the conviction, he would not prevail on this issue. The State met its burden of providing prima facie evidence of the conviction by presenting the penitentiary packet that showed that Smith's notice of appeal was denied. If the judgment had indicated that Smith filed a notice of appeal and the notice of appeal had not been denied, the presumption of finality would have been overcome, and the State would have been required to provide proof of finality. *See Fletcher*, 214 S.W.3d at 8. In this case, however, the State made a prima facie showing of finality by showing that the notice of appeal had been denied, and the burden to prove that the enhancement conviction had not become final fell on Smith. *See id*. Smith did not provide any evidence that the conviction had been appealed. Thus, the evidence was legally sufficient to prove that Smith's 1994 conviction for possession of a forged check was final. We therefore overrule this issue.

### *Authority to Impose Fine as Punishment*

In his third issue, Smith contends that the trial court erred in imposing a $6,000 fine on Smith when a fine was not authorized by statute. The State concedes that the trial court erred in imposing the fine. We agree with both parties that the statute that provides the applicable punishment range does not authorize the imposition of a fine. *See* Tex. Penal Code Ann. §12.42(d) (West Supp. 2009). The statute states only that:

22

[I]f it is shown on the trial of a felony offense other than a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction he shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years.

*Id*. Because the statute does not authorize the imposition of a fine, we conclude that the trial court erred in imposing a fine on Smith. Accordingly, we modify the judgment to delete the $6,000 fine.

## CONCLUSION

Because we conclude that the evidence is factually sufficient to support Smith's conviction and legally sufficient to establish the finality of the first enhancement conviction, and because we conclude that the trial court erred in imposing a $6,000 fine on Smith, we modify the trial court's judgment to delete the fine, and we affirm the judgment as modified. *See* Tex. R. App. P. 43.2(b).

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Modified, and as Modified, Affirmed

Filed: July 14, 2010

Do Not Publish

23