

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00223-CR

**CURTIS GOSS,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 35302CR

## MEMORANDUM OPINION

A jury found Appellant Curtis Goss guilty of the state jail felony offense of theft of wire and assessed his punishment, enhanced by previous felony convictions, at twelve years' confinement. This appeal ensued. In his sole issue, Goss contends that the evidence is insufficient to support his conviction. We will affirm.

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the

light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011), *cert. denied*, 132 S.Ct. 2712 (2012).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. 307 at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits a theft offense if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2012). As relevant here, appropriation of property is unlawful if it is without the

owner's effective consent. *Id.* § 31.03(b)(1). To "appropriate" means to acquire or otherwise exercise control over property other than real property. *Id.* § 31.01(4) (West Supp. 2012). At the time this incident occurred, a theft offense was a state jail felony if the value of the property stolen was less than $20,000 and the property stolen was insulated or noninsulated wire or cable that consisted of at least fifty percent copper. Act of May 15, 2007, 80th Leg., R.S., ch. 304, 2007 Tex. Gen. Laws 580, 581, *amended by* Act of May 23, 2009, 81st Leg., R.S., 2009 Tex. Gen. Laws 804, 805.

The evidence presented at trial was as follows: James Sturm testified that on June 24, 2010, he was working for Sunrise Personnel at Gerdau Ameristeel. As the front loader, he would load scrap metal into a "hopper," which would then go up a conveyor belt to a "picking station." At the picking station, about eight people would hand pick through the material, separating copper, aluminum, etc., by throwing it into chutes that led to separate bins underneath. Sturm observed some of the workers at the picking station taking copper from the picking station to the break room, located about "half a football field" away, in small cardboard boxes and loading them into bags. It took several trips to fill the bags. Sturm did not know Goss's name but identified him at trial as one of the people he saw taking the copper from the picking station and putting it into bags.

Sturm notified his supervisor, Jay Johnson, who "stood back and watched everything taking place" and then alerted security. Sturm identified State's Exhibits 1 and 2 as photographs of the bags that he saw the copper being put into that night. Goss's bag was the blue backpack shown in Exhibit 1. When Goss came in with the

backpack that day, it did not appear to be heavy and full of copper. When the workers left at the end of the shift, he could tell that the bags were "pretty heavy" because of the way they were walking.

Johnson testified that he told two of his employees to check in the break room and inspect the bags. They told Johnson that there was copper in the backpacks, so he contacted the guard shack about the theft. The copper used at Gerdau Ameristeel and on the conveyer belt at the picking station is "number one copper," which is fifty percent or more copper. The coiled copper wiring that was found in the bags was also number one copper.

Troy Wilson testified that he was working at Gerdau Ameristeel through Sunrise Personnel on June 24, 2010. Johnson told him that some materials were being moved to the break room and sent him there to look for boxes with copper in them. He did not find any boxes, but he found the backpacks shown in State's Exhibits 1 and 2. He opened them up and found a lot of copper in them. The copper is high grade, probably ninety percent or more pure. Copper processed through Gerdau Ameristeel can be valued at up to $8,000 per ton. Wilson took some pictures, zipped the bags back up, and left them where they were. He then notified Johnson that copper was being taken out. The value of the copper in the bags was more than zero and less than $20,000.

Tim Nazworth, a paramedic and security guard for Gerdau Ameristeel, testified that he was working the main gate on the night of June 24, 2010. He got a call that prompted him to stop the Sunrise Personnel van when it was leaving. He was looking for copper. He asked for consent to search the vehicle, and those in the van consented.

Nazworth searched through all the bags on the van and found two bags loaded full of copper. Those bags are shown in State's Exhibits 1 and 2. When asked to whom the bags belonged, Goss stated that one of the bags was his. Nazworth then called the Midlothian Police Department.

Nazworth stated that at no time did he give Goss permission to take any copper from Gerdau Ameristeel. He is not aware of anyone giving Goss permission to take copper from Gerdau Ameristeel.

James McGilber testified that he is a recruiter and driver for Sunrise Personnel. On June 24, 2010, Goss was one of the workers he took to Gerdau Ameristeel to work. Goss had a blue backpack with him, the one shown in State's Exhibit 1, when he arrived to get into the van to go to Gerdau Ameristeel that night. The backpack did not appear to be loaded down or weighted down at that time. When McGilber returned to pick up the workers, he noticed that the long black bag, shown in State's Exhibit 2, appeared to be heavy, and he warned the workers that they would go to jail if they were caught stealing. When they got to the guard station, the van was stopped and searched. They found two bags loaded down with Gerdau Ameristeel's materials. Goss claimed one of the bags, the one shown in State's Exhibit 1. McGilber stated that the bag appeared to be heavier than when he had seen it earlier in the day.

Officer Daron Ehly with the Midlothian Police Department testified that he was called to Gerdau Ameristeel on June 24, 2010 because of an alleged theft. When he arrived, he saw copper in two bags, the bags shown in State's Exhibits 1 and 2. He asked to whom the bags belonged, and Goss claimed the blue backpack shown in

State's Exhibit 1. Another individual claimed the other bag. When Ehly talked to Goss about where the copper came from, Goss explained that he had found it on his way to work on the side of the road. After also talking to the driver of the van, the security guards, and the person who claimed the other bag, Ehly concluded that an offense was being committed, so he arrested Goss and the other individual claiming the other bag.

Goss testified in his own defense. Goss had been working for Sunrise Personnel for two days when he was arrested at Gerdau Ameristeel. Goss denied carrying any copper to the break room and denied knowing anything about anyone carrying copper in cardboard boxes to the break room. Goss stated that he only went to the break room when the manager told them it was break time, which he thinks was three times. Goss agreed that he claimed a bag after the search of the van but said that it was neither of the bags shown in State's Exhibits 1 and 2. He claimed a black bag that contained his lunch, as well as copper and metal that he had found over at Sunrise Personnel. When he was walking around near Sunrise Personnel waiting for McGilber to take them to Gerdau Ameristeel, he saw several pieces of metal and picked them up and put them in his backpack. His backpack did not have as much in it as those shown in State's Exhibits 1 and 2. He only had about seven pieces of metal in his bag. The other man, Tony Sprull, had two bags, and Goss was present when Sprull admitted to the officer that he had stolen the copper. Goss only knew Sprull through the job, so Goss had only known Sprull for two days.

The State recalled Ehly on rebuttal. A recording from his patrol car was admitted. Ehly stated that he is certain that the blue backpack shown in State's Exhibit

1 is the same backpack Goss admitted was his several times on the video. The backpack weighed about fifty pounds. Goss told him that he had picked up the copper on the way to work.

Goss argues that the foregoing evidence is insufficient to support his conviction because he denied committing the offense, Sprull admitted the entire act, and the State's witnesses could not have witnessed what they testified to. By finding Goss guilty, however, the jury obviously believed the testimony from the State's witnesses and did not believe Goss's testimony. The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981)). A jury may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002); *see also Sharp*, 707 S.W.2d at 614. We must defer to the jury's determination concerning what weight to give the contradictory testimonial evidence. *See, e.g., In re A.B.*, 133 S.W.3d 869, 873-74 (Tex. App.—Dallas 2004, no pet.); *Scugoza v. State*, 949 S.W.2d 360, 362-63 (Tex. App.—San Antonio 1997, no pet.); *Fetterolf v. State*, 782 S.W.2d 927, 933 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd).

Viewing all the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to support Goss's conviction. We overrule Goss's sole issue and affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed October 25, 2012
Do not publish
[CR25]