

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00374-CR

**TAB DENNY JOHNSON,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 249th District Court
Johnson County, Texas
Trial Court No. F47165**

## MEMORANDUM OPINION

A jury convicted Appellant Tab Denny Johnson of two counts of criminal solicitation and assessed his punishment at twenty-two and thirty-five years' imprisonment, respectively. This appeal ensued.

### Background

Barbara Johnson testified that she and Tab had been married for about eleven years when she filed for divorce in September 2012. She and Tab began maintaining separate residences, and a protective order was entered against Tab in October. Tab

allegedly violated the protective order in Tarrant County and went to jail, but he bonded out. Tab then allegedly violated the protective order in Johnson County and went to jail again on November 23, 2012. In the meantime, Barbara met Leonard Taylor, and he became her boyfriend.

Michael Gonzales testified that he was in the Johnson County jail from mid-November to mid-December 2012 and that Tab approached him during that time. Tab told Gonzales that his wife had left him and that he wanted her back. Tab asked Gonzales to scare his wife into coming back to him but then later requested that Gonzales "take care of" his wife and made the hand motion of pointing a gun to his head. Gonzales took this to mean that Tab wanted him to kill his wife. Tab offered Gonzales $1,000 upfront and then money to be paid each month or so after that (Gonzales did not remember the exact amount). Gonzales played along to make Tab think that he might be willing to do it, but Gonzales never intended to go through with it. Gonzales just thought that he might get some money from Tab. Tab told Gonzales that his sister would help Gonzales get whatever he needed. Gonzales said that when he got out of jail, he contacted Tab's sister but got the runaround.

JoAnn McAdoo, Tab's half-sister, testified that she was assisting Tab and serving as his power of attorney while he was in the Johnson County jail in December 2012. Tab's pickup truck and travel trailer were at a campground where he had been living after the divorce was filed. Tab asked McAdoo to withdraw $165 from his account, to deliver the money and his truck keys to a woman named Ashley, and to tell Ashley the location of the truck and travel trailer. Based on what Tab had told her, McAdoo

thought that Ashley was going to take the truck and travel trailer to someone named Mike Gonzales, who had agreed to store them on his property, which would save Tab the monthly fees he was paying. McAdoo and her husband met with Ashley and Ashley's friend Jeffrey and gave Ashley the money and the truck keys. McAdoo stated that she was concerned about the trustworthiness of these people because they were people that Tab had met because of his time in jail; she knew nothing about doing this so that Tab's wife or her boyfriend could be killed.

Texas Ranger Michael Don Stoner testified that he met with Johnson County Sheriff's Lieutenant Bryan Peterson at the Johnson County jail on January 2, 2013. Inmate William "Billy" Chalfant informed them at that time that Tab had solicited more than one person to kill his wife Barbara. Ranger Stoner and Lieutenant Peterson then met with Johnson County Sheriff Bob Alford and decided that, to further the investigation, Sheriff Alford would go undercover as a hit man. Lieutenant Peterson testified that they instructed Chalfant to tell Tab that he had a friend that might be able to help him. Ranger Stoner testified that Chalfant was then given a phone number to call at 3 p.m. on January 3 and was instructed to give Tab the phone and to take no other part after making the introduction.

Sheriff Alford testified that at 3 p.m. on January 3, Chalfant called him from the Johnson County jail and then handed the phone to Tab. Texas Ranger Adam Sweaney testified that he was in the control center room at the Johnson County jail where he could see the telephones. Ranger Sweaney confirmed that the informant made the

phone call at 3 p.m. and then handed the phone over to Tab. An audio recording of the phone conversation was made, and it was admitted into evidence.

During the conversation, Tab stated that he needed "the trash to be taken out and disposed of and the extra trash too." When asked by Sheriff Alford[1] what he was willing to pay, Tab replied, "[W]hat I was gonna do is basically set up an account with a debit card and give whoever does this a debit card and they'll just go get the money out once a month. I'd have it put in there every month." Sheriff Alford stated that he would need something up front, to which Tab replied that he had two ATVs, a pontoon boat, and a truck that he was hoping to get rid of to get bail money. Sheriff Alford responded, "[Y]ou just think about it, though, man, till this trash is disposed of, you're in the best place in the world to be." Tab agreed and said that his wife had tried to kill him three times. Sheriff Alford then said that he would hold the two ATVs until Tab got the cash, and Tab replied, "Yeah, that'll work." Sheriff Alford also told Tab that he was going to send a man to see Tab who would be posing as his lawyer and that Tab should get a paper and envelope and write down all the information that Sheriff Alford needed. At that point, Tab mentioned that "another guy" had come "in the picture" and that "he's got to be taken care of" and "moved out of the picture." Tab said that he wanted his wife to be "broken down" by her helping to "take out that trash." Tab then stated that if "it can't be broken," then the "trash just needs to be … disposed of … [a]nd dumped, kind of like an O.D." Tab assured Sheriff Alford that he would write it

[1] Sheriff Alford used the nickname "Beau" while posing as a hit man.

Johnson v. State                                                                                                Page 4

all down.  Sheriff Alford instructed Tab to seal the envelope and write his initials across the seal so that he could make sure that the envelope was not opened.

A Texas Department of Public Safety criminal investigator testified that he went to meet Tab in the jail on January 4 and had an attorney-client (face-to-face) type of visitation with him.  When Tab entered, the investigator introduced himself and explained that he was not an attorney but that he was there to pick up the package for Sheriff Alford.  The investigator testified that Tab appeared to understand what he was talking about and had no hesitation in speaking openly about what was going on.  The investigator talked with Tab about how he was going to pay for the murder.  Tab explained that he had two four-wheelers and a pontoon boat that he was willing to use for payment.  Tab said that where they were located and how to get them was included in the envelope.  Tab also said that it would be safer and look better for him if he was in jail when the murder took place.  When the investigator asked if Tab had spoken to anyone else about this, Tab replied that, about three weeks before, he had talked to a person named Mike Gonzales about doing it but that he did not feel like Gonzales was going to take care of the problem for him.  When Tab stood up to leave, he dropped the envelope, and the investigator picked it up.  The envelope was sealed with the handwritten words, "Now is the time," written around the seal.  When the investigator left the visitation room, he handed the envelope to Ranger Stoner.

The envelope and its contents were admitted into evidence.  The enclosed pages were handwritten.  The first page detailed personal information about Barbara, including a physical description of her and information about where she lived and

worked. The first page also included information about Barbara's son, who was described as "not included," and her boyfriend. The last sentence of the first page stated, "The xtra trash (BF) has to be removed totally." The second page contained a list of instructions similar to those Tab discussed in the phone call with Sheriff Alford. The instructions included, "Dispose of the trash (the xtra trash BF especially) xtra disappear," "Make her help," "Break down completely," and "Take time to make sure she's broken." Barbara was then to "drop all charges – court orders (Tarrant – Johnson County)" and "go back to her husband." But "[i]f not broken OD with ID & note." Ranger Stoner testified that "OD" is a common way that people say the term "overdose." The third and fourth pages provided payment information and details about the ATVs and pontoon boat, which were to be used as collateral. The fourth page included the statement, "Needs to be done ASAP/now." Finally, the fifth page provided an example of a note that Barbara was supposed to sign. The note was addressed to Tab and the Fort Worth and Burleson Police Departments. It stated that she hated herself and could not live with herself anymore because of all of the lies she had told about her husband.

Sheriff Alford testified that he subsequently had a second phone conversation with Tab on January 5 to give him the opportunity to back out. Ranger Stoner testified that Chalfant was instructed to make the second phone call at 1:30 p.m. Sheriff Alford stated that no one was in the jail watching the telephones during the second call but that, after hearing their voices on the first phone call, he recognized Chalfant's and

Tab's voices on the second phone call. An audio recording of the second phone conversation was made, and it was admitted into evidence.

During the second phone conversation, Sheriff Alford said, "[B]efore I put anymore money in this thing, I need to know from you." Tab did not try to call off the deal. Tab instead confirmed that Barbara's boyfriend was "gonna have to be removed from the picture altogether." Tab also said, "If she cannot be broken or you have, I mean, any doubts once you're - - you know, you're almost done with it, if you have any doubts, then take her out, too." Sheriff Alford then told Tab that it would be $8,000 to kill the boyfriend and $10,000 if he had to kill both of them. Tab agreed.

Sheriff Alford testified that he had a final phone conversation with Tab on January 7 to tell Tab that he had killed Barbara and her boyfriend Leonard Taylor. Again, no one was in the jail watching the telephones during the third call, but Sheriff Alford stated that he recognized the voices on the call. An audio recording of the third phone conversation was made, and it was admitted into evidence.

During the third conversation, Sheriff Alford told Tab that both Barbara and her boyfriend had been killed. Sheriff Alford detected no remorse or regret in Tab's voice. Tab instead immediately started talking about how Sheriff Alford was going to be paid. At one point, Sheriff Alford said, "[T]here's no bodies." Tab replied that "hers does need to show up" "[b]ecause there's too many questions when there's not one." Sheriff Alford said that that could happen. Tab was arrested following the third phone conversation.

Tab testified that he was in the Johnson County jail in December 2012 and January 2013. He stated that he met Mike Gonzales but that the Mike Gonzales that he knew was not the man who had testified. Tab said that he never talked to Gonzales about hiring him to kill Barbara or Barbara's boyfriend. In fact, he did not even know at that time that Barbara had a boyfriend; he only knew that there was a man helping her. Tab nevertheless acknowledged that he had instructed McAdoo to hand over the keys to his truck because Gonzales said that he would put his truck and travel trailer where it could be stored.

Tab testified that he met Chalfant in December 2012. Chalfant approached him, and Tab was afraid of Chalfant because Chalfant is an "extremely rough" man, because of some of the stories Chalfant was telling, and because Tab suffers from a medical condition. When asked if he had ever reported to any authority that he was concerned about his safety, Tab replied that he had put in a request to speak to someone of authority in the jail but that he got no response. Regarding the phone calls, Tab stated that Chalfant made the phone calls and then gave Tab the phone. Tab said that Chalfant then stayed right beside him, listening in on the calls, and basically told him what to say. Tab testified that Chalfant told him that if he did not do as he was told, he "would not wake up the next morning." In other words, Tab was being forced to say things in the phone calls that he did not want to say.

Tab also testified that he needed to have his travel trailer winterized. He said that there was a bag of trash in his trailer with rotten food in it, and when he mentioned taking out the trash, he was referring to the trash in his travel trailer. The "extra trash"

was a reference to the food that was still in the refrigerator. Tab stated that he was willing to pay up to $500 plus the storage fees and whatever else it cost to winterize his travel trailer. He was offering the two ATVs and the pontoon boat as collateral.

Regarding the envelope and its contents, Tab testified that Chalfant instructed him what to write down. Tab said that Chalfant made him rewrite it three times. Chalfant took the other two copies, tore them up, and flushed them down the toilet. Tab stated that he turned the envelope over on January 4 to someone whom he thought was a lawyer. He did not know what the lawyer was going to do with it. Tab stated that it was never his desire to have his wife or her boyfriend killed.

**Sufficiency of the Evidence**

In his first issue, Tab contends that the evidence was insufficient to support his convictions because there is no proof from any witness that he wanted Barbara and Taylor killed and because he proved by a preponderance of the evidence that he acted under duress. The constitutional standard of review applies to the elements of an offense that the State must prove beyond a reasonable doubt while a different standard of review applies to elements of an affirmative defense that the defendant must prove by a preponderance of the evidence. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Tab challenges both the sufficiency of the evidence to support an element that the State must have proven and the sufficiency of the evidence to support an adverse finding on his affirmative defense. We will address each in turn.

The Court of Criminal Appeals has expressed our constitutional standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

Here, Tab argues that the evidence was insufficient to support his convictions because there is no proof from any witness that he wanted Barbara and Taylor killed. Specifically, Tab asserts that the testimony shows that he never requested that Barbara

be killed but rather that he requested only that Barbara be broken down so that she would come back to him. But in both the first and second phone calls with Sheriff Alford, as well as in the letter given to the investigator, Tab said that if Barbara could not be broken down, she should be killed. Also, Gonzales testified that Tab requested that he "take care of" Barbara and made the hand motion of pointing a gun to his head, which Gonzales took to mean that Tab wanted him to kill his wife. Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to support Tab's convictions.

Tab next argues that the evidence was insufficient to support his convictions because he proved by a preponderance of the evidence that he acted under duress. Specifically, Tab asserts that we cannot overlook the uncontroverted evidence of duress, including that he was threatened by Chalfant and that he even filed requests to speak to someone in authority at the jail because he was concerned about his safety but that those requests were never answered.

The standard of review for the legal sufficiency of the evidence to support an adverse finding on an affirmative defense is as follows:

> When an appellant asserts that there is no evidence to support an adverse finding on which [he had] the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable factfinder could not. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*Matlock*, 392 S.W.3d at 669.

In applying the standard to this case, our first step is to look for more than a mere scintilla of evidence supporting the jury's implied finding that Tab was not acting under duress. *See id.*; *see also Burns v. Rochon*, 190 S.W.3d 263, 267 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence."). In doing so, we must disregard all evidence that Tab was acting under duress unless a reasonable factfinder could not do so. *See Matlock*, 392 S.W.3d at 669. If no evidence supports the jury's finding that Tab was not acting under duress, then in the second step, we search the record to see if he established, as a matter of law, that he acted under duress. *See id.* If the record reveals evidence supporting Tab's position that he acted under duress, but that evidence was subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve, we will not consider that evidence in our matter-of-law assessment. *See id.* at 670.

The evidence shows that Tab discussed the prospect of having his wife killed with inmates other than Chalfant (*e.g.*, Gonzales). In the telephone conversations with Sheriff Alford and in the detailed note, Tab expressed his intent that Barbara and Taylor be killed and his willingness to compensate Sheriff Alford for the murders. Sheriff Alford also testified that when he told Tab that Barbara and Taylor had been killed, Tab showed no signs of remorse. Thus, there is circumstantial evidence supporting the jury's implied finding that Tab was not acting under duress.

Furthermore, the evidence supporting Tab's position that he acted under duress was evidence that a reasonable jury was entitled to disbelieve. The jury is the exclusive

judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A jury may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). By finding Tab guilty, the jury obviously disbelieved his testimony that he acted under duress. As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). We therefore conclude that the evidence is legally sufficient to support the jury's implied adverse finding on his affirmative defense of duress. Tab's first issue is overruled.

## Rule 404(b)

In his second issue, Tab contends that the trial court erred in allowing the State to introduce extraneous offenses because it violated Rule 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

TEX. R. EVID. 404(b).

Tab first argues that the State improperly presented evidence of him having a protective order (including a finding of family violence) against him, and of his further violations of that protective order, because the State's purpose in offering that evidence

was solely to prove bad character. Tab also asserts that the State improperly introduced testimony regarding the criminal solicitation of persons other than Sheriff Alford. Tab claims that these could have been additional counts to the indictment but that the State instead "chose to backdoor the evidence in as extraneous offenses." The State responds that the introduction of the evidence did not violate Rule 404(b) because the evidence was admitted for other purposes than to prove character conformity—namely, motive and intent. We agree with the State.

The evidence that Barbara had a protective order against Tab and that he had violated the protective order helped to demonstrate Tab's motive to commit the offense. Tab indicates in the handwritten instructions to Sheriff Alford that at least part of the reason for committing the offense was because he wanted Barbara to drop these charges. Furthermore, Tab is guilty of the offense of criminal solicitation only if he acted with intent that a capital murder be committed. *See* TEX. PENAL CODE ANN. § 15.03(a) (West 2011). And Tab's main defense was that he acted under duress. Tab testified that he said things in the phone calls and the handwritten instructions that he did not want to say because he was afraid of Chalfant. But the evidence that Tab had criminally solicited persons other than Sheriff Alford (Gonzales, for example) indicated that he actually intended that the capital murder be committed.

Tab also argues in his second issue that the State was required to provide notice to his attorney of any extraneous offenses it was seeking to admit and that the State failed to give notice that it intended to introduce the allegation that Tab committed the offense of criminal solicitation by trying to get Chalfant to kill Barbara and Taylor. But

no such allegation was ever admitted into evidence. Chalfant did not testify, and Ranger Stoner testified only that Chalfant informed them that Tab had solicited more than one person to kill his wife. Ranger Stoner said that those persons included Mike Gonzales and Anthony Salazar. Tab was provided notice of the State's intent to introduce evidence that Tab criminally solicited Gonzales and Salazar. The trial court, therefore, did not err in allowing the State to introduce extraneous offenses. We overrule Tab's second issue.

Having overruled both of Tab's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed December 31, 2014
Do not publish
[CRPM]

