TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00012-CV






In the Matter of J. F.







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. J-28,431, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING



 

M E M O R A N D U M O P I N I O N


 A juvenile court adjudicated J.F. delinquent after finding that he committed the
offense of assault. On appeal, J.F. contends that (1) the judgment of delinquency erroneously recites
two counts of assault even though he was found to have committed only one; (2) the juvenile court
deprived him of due process by misconstruing the burdens of proof on his self-defense claim; and
(3) the evidence was factually insufficient to show that he committed assault. We will modify the
judgment and affirm it as modified.


FACTUAL AND PROCEDURAL BACKGROUND

 J.F. and a classmate got into an altercation while standing in line at their school's
cafeteria. J.F. punched his classmate once in the face. It is not clear from the record exactly how
the altercation ended, but after it did, James Thorpe, an Austin Independent School District ("AISD")
police officer, investigated. Besides J.F. and the classmate J.F. punched, Officer Thorpe interviewed
only one witness: a woman who worked in the cafeteria. She told Officer Thorpe that she had seen
J.F. punch his classmate but had not seen everything that transpired between the boys beforehand.

 Officer Thorpe interviewed and photographed J.F. and his classmate soon after the
incident. A close-up photograph of J.F.'s hand showed swelling and bruising. Head-shot
photographs of J.F. did not appear to show any damage to J.F.'s face or neck. The photograph of
J.F.'s classmate, however, clearly showed swelling and bruising around one of his eyes.

 After interviewing and photographing J.F. and his classmate, Officer Thorpe phoned
the classmate's mother. She told Officer Thorpe that she wished to press charges against J.F., so
Officer Thorpe called fellow AISD officer Chris Roddy to pick up J.F. and transport him to Gardner-Betts Juvenile Detention Center. After Officer Roddy arrived at J.F.'s school, Officer Thorpe called
J.F's father to inform him that J.F. was going to be arrested and taken to Gardner-Betts. J.F's father
had spoken with J.F. on the phone by that point, and he told Officer Thorpe to inspect J.F's neck for
damage because J.F. claimed that he had been choked by his classmate before punching him. Officer
Thorpe inspected J.F.'s neck and saw no injuries. Officer Roddy was present during the inspection
and later testified that he did not remember noticing any injuries to J.F.'s neck at the time. Before
handcuffing J.F. and putting him in the back of his police car for transport, Officer Roddy asked J.F.
if he had any injuries. J.F. mentioned only his hand, which he said had been broken in a previous,
unrelated incident.

 Officer Roddy noticed that J.F. appeared to move around a good deal in the back of
the police car during the approximately twenty-minute trip to Gardner-Betts. After arriving at
Gardner-Betts, Officer Roddy informed the intake officer that J.F.'s hand was injured. The intake
officer accordingly called the facility's nurse, who examined J.F. and, among other things, noticed
red marks on his neck. Officer Roddy also saw the marks on J.F.'s neck at that time. 

 J.F.'s father picked up J.F. from Gardner-Betts several hours later. Shortly after doing
so, he took pictures of J.F.'s neck with his cellular telephone. The pictures appear to show marks
or abrasions on both sides of J.F.'s neck. J.F. introduced those photographs as evidence at trial.

 The State eventually filed a petition charging J.F. with two counts of assault: one for
punching his classmate, and one for pushing his classmate. A bench trial was held. The State called
the following witnesses: the cafeteria worker who had seen J.F. punch his classmate; the classmate
himself; the classmate's mother; Officers Thorpe and Roddy; and Officer Jerry Stovall, an AISD
officer with whom J.F.'s father spoke the day after the fight. J.F. did not testify himself, but he
called as witnesses his father and two classmates who claimed to have seen the fight. J.F.'s attorney
argued self-defense; she claimed, and J.F.'s witnesses testified, that J.F. had punched his classmate
only after the classmate tried to choke him.

 After trial, the court recited its findings orally. It found that the State had proven
beyond a reasonable doubt that J.F. had assaulted his classmate by punching him. The court did not
address whether J.F. had also pushed his classmate. The court also found that "some of [J.F's]
witnesses were extremely incredible" and that "the defense has not met its burden on the [self-defense] claim as it shifted over to the State." The court sentenced J.F. to six months' probation and
required him to complete 20 hours of community service and an anger-management course. 

 The court subsequently formalized its findings by signing a Judgment of Delinquency. 
In contrast to the court's oral recitations, the Judgment stated that J.F. had assaulted his classmate
by both punching and pushing him. J.F. subsequently appealed. 


STANDARD OF REVIEW

 We apply the same standards of proof and review to juvenile cases as we do to
criminal cases. See Tex. Fam. Code Ann. § 54.03(f) (West 2008 & Supp. 2009); In re C.M.G.,
180 S.W.3d 836, 838 (Tex. App.--Texarkana 2005, pet. denied). Thus, in a factual-sufficiency
review, we view the evidence in a neutral light and ask whether the fact-finder was rationally
justified in finding guilt beyond a reasonable doubt. See Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006). We then determine (1) whether the evidence supporting the verdict is so
weak that the verdict is clearly wrong and manifestly unjust or (2) whether the verdict is against the
great weight and preponderance of the conflicting evidence. Id. at 414-15. We will not reverse a
verdict for factual insufficiency unless we can say, with some objective basis in the record, that the
great weight and preponderance of the evidence contradicts the fact-finder's verdict. Id. at 417. 
Nor will we intrude on the fact-finder's role as the sole judge of the weight and credibility of witness
testimony. Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The trial judge is
the fact-finder in bench trials, and we give the same deference to a trial judge's credibility and
weight determinations as we would a jury's. See Joseph v. State, 897 S.W.2d 374, 376 (Tex. Crim.
App. 1995).


DISCUSSION

 J.F. raises three issues on appeal. We address them in turn.


The Judgment Erroneously States that J.F. Was Adjudicated Guilty of Two Counts of Assault

 J.F. argues that we should reform the Judgment of Delinquency because it states that
J.F. assaulted his classmate by both punching and pushing him, whereas the juvenile court orally
pronounced only a finding that J.F. punched his classmate. The State's petition charged two counts
of assault, one for punching and one for pushing. The State admits, though, that at the conclusion
of trial the court made a finding only as to the punching count. Accordingly, the State concedes that
the Judgment is erroneous and should be reformed. We therefore modify the Judgment to reflect that
J.F. was found to have committed one count of assault by punching and was not found to have
committed assault by pushing as well. See Tex. R. App. P. 43.2.


The Juvenile Court Applied the Wrong Burdens of Proof to J.F.'s Self-Defense Claim

 J.F. next argues that the juvenile court deprived him of due process by applying the
wrong burdens of proof to his self-defense claim. In its written Findings of Fact and Conclusions
of Law, the court stated: "Upon the State meeting its burden beyond a reasonable doubt, the burden
then shifted to Respondent to prove, by a preponderance of the evidence, the affirmative defense of
self-defense." J.F. is correct that this is a misstatement of the law; when a defendant claims self-defense, his only burden is to produce some evidence supporting the claim. Zuliani v. State,
97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The burden of persuasion then shifts to the State,
which must prove beyond a reasonable doubt that the defendant did not act in self-defense. See
Saxton v. State, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). 

 The State admits that the juvenile court misstated the burdens governing J.F.'s self-defense claim but argues that, under the "right ruling, wrong reason" doctrine, the misstatement was
harmless because the court "properly applied the self-defense rule and fully articulated the basis for
its rejection of [J.F.'s] self-defense claim." See State v. Herndon, 215 S.W.3d 901, 905 n.4
(Tex. Crim. App. 2007) ("[T]the general rule is that a trial court's ruling will be upheld if it is correct
on any applicable legal theory, even if the court articulated an invalid basis. This is the 'right ruling,
wrong reason' doctrine."). 

 We agree with the State. Self-defense is an issue of fact to be determined by the fact-finder. Saxton, 804 S.W.2d at 913. Even though the court recited the wrong burdens of proof, it also
explicitly found that (1) the State established its assault case beyond a reasonable doubt and (2) J.F.'s
self-defense evidence was not credible. As we discuss below, the former finding was supported by
factually sufficient evidence. Thus, under the correct burdens of proof, the court's findings
supported a determination that J.F. did not act in self-defense. See id. The recitation of incorrect
burdens of proof was therefore harmless. We overrule J.F.'s second point of error.


The State's Evidence Was Factually Insufficient

 Finally, J.F. argues that the State's evidence was factually insufficient to support a
finding that J.F. assaulted his classmate. We disagree. Evidence is factually insufficient to support
a verdict only if the great weight and preponderance of it contradicts the verdict. See Watson,
204 S.W.3d at 417. J.F. did produce some evidence to support his self-defense claim--namely,
two eyewitnesses who testified that his classmate tried to choke him, and photographs taken several
hours after the altercation that appeared to show damage to his neck. The juvenile court found J.F.'s
witnesses incredible, however, and found it significant that the photos taken of J.F. immediately after
the altercation did not also show damage to J.F.'s neck. The court also found the State's witnesses
credible, including, most importantly, J.F.'s victim himself, who testified that he did not try to choke
J.F. before J.F. punched him. We must defer to the court's credibility determinations, see Joseph,
897 S.W.2d at 376, and the photographs of J.F.'s neck are equivocal. (1) On this record, then, we
cannot say that the court's findings are "clearly wrong and manifestly unjust" or "against the great
weight and preponderance of the conflicting evidence." Watson, 204 S.W.3d at 414-15. We
overrule J.F.'s third point of error.


CONCLUSION

 We affirm the Judgment of Delinquency because it was supported by factually
sufficient evidence. We modify the Judgment, however, to reflect that J.F. was found to have
committed only assault by punching, not assault by pushing as well.



 __________________________________________

 David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Modified and, as Modified, Affirmed

Filed: January 22, 2010
1. The State suggested that red marks first appeared on J.F.'s neck after J.F. was transferred
to Gardner-Betts because J.F. likely scratched his neck on the seatbelt in the police car that
transported him there. The photographs taken of J.F. immediately after the altercation are consistent
with this theory, as they do not show any red marks on J.F.'s neck. On the other hand, those
photographs are not close-ups like the photos taken of J.F. several hours after the altercation, so it
is possible that their resolution was simply not high enough to show the marks. It is also possible
that the marks simply took some time to develop. Whatever the case, taken together, the
photographs of J.F.'s neck do not conclusively support either side's theory.