

# NUMBER 13-22-00329-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TERRY MICHAEL TURNER,                                              Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

### On appeal from the 440th District Court
### of Coryell County, Texas.

## MEMORANDUM OPINION

### Before Justices Tijerina, Silva, and Peña
### Memorandum Opinion by Justice Silva

Appellant Terry Michael Turner appeals his conviction for aggravated kidnapping, a first-degree felony, enhanced by a prior felony conviction. *See* TEX. PENAL CODE ANN. §§ 12.42(c)(1), 20.04. By two issues, Turner argues that (1) the trial court erred when it denied his motion for new trial, and (2) the evidence was legally insufficient to support a

deadly weapon finding. We affirm.

## I. BACKGROUND[1]

Turner was indicted for aggravated kidnapping, with an enhancement paragraph alleging a prior conviction for the offense of kidnapping. A four-day jury trial was held, where the following pertinent testimony was presented.

### A. Trial

### 1. Heather Stouth

Heather Stouth testified that she met Turner sometime in June 2019, after which they began dating and living together. Stouth testified to a series of domestic violence incidents wherein Turner would assault her but subsequently apologize, causing them to reconcile. Stouth described Turner as jealous and suspicious, explaining that he would video chat with her during his breaks from work and make her show him that nobody else was in the home.

In the early morning of September 23, 2019, Turner wanted to have sex, but Stouth declined, explaining she was tired and "having a hard time keeping [her] eyes open." Turner demanded that Stouth unlock her phone so that he could look at it, but she declined, which led to an argument. After Turner threatened to smash her phone with a hammer, Stouth went back to their bedroom. Stouth detailed that Turner walked into the bedroom and she suddenly felt like she was having a seizure and falling. Stouth clarified that Turner "had [come] up behind [her] and choked [her]" using his arm. Stouth

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. Because this is a transfer case, we apply the precedent of the Waco Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.

"remember[ed] feeling like [she] was falling and then waking up on the bed." When Stouth awoke, "[Turner] was sitting at the end of the bed with [her] feet and wrapping electrical tape around [her] legs." Turner then tied Stouth's arms and wrists in front of her using the sash from her robe. Turner also applied duct tape over Stouth's mouth.

According to Stouth, Turner threatened to cut her throat if she screamed. "And then [Turner] said that if [she] was[ not] going to have sex with him willingly, that he would just take it." Stouth testified that he proceeded to sexually assault her for several minutes. Stouth explained that she scratched Turner so he would stop, prompting him to slap her. After Turner slapped Stouth, he walked away, and she told him that she needed to use the restroom. "[Turner] grabbed a knife that was on the night[]stand, and he cut the tape off of my legs," Stouth continued. "He untied my arms and took the tape off of my mouth and told me once again if I screamed, he would slit my throat." Stouth described the knife as "kind of like a pocketknife that [Turner] always used for random things."

Later that morning, Turner left, explaining that he needed to "pay some fines." Turner returned to the home with his ex-fiancé, Bobbie Walters. According to Stouth, she was laying down when Turner entered the room and told her that she needed to get out. An argument ensued and Turner smashed Stouth's cell phone with a hammer. Turner began throwing Stouth's things outside, prompting Stouth to ask Walters to call the police. Walters declined, so Stouth eventually went to her neighbors to ask that they call the police. Stouth did not initially tell the police about the incident, but she eventually reported what happened.

Although law enforcement directed Stouth to have an examination done by a

3

sexual assault nurse examiner (SANE), Stouth did not comply because she claimed that she did not have transportation.

### 2. Dylan Mathis

Dylan Mathis testified that he lived in the duplex adjoining Turner and Stouth's at the time of the incident. Mathis testified that he could hear fights coming from their unit, including cursing and falling or thrown objects. According to Mathis, he and his visitor, Shilo Shands, were in his unit on September 23, 2019, when they heard arguing. Stouth eventually knocked on Mathis's door, asking Mathis and Shands to call the police. Mathis described the events upon law enforcement's arrival, such as Turner's refusal to comply until additional officers arrived on scene and "[t]hings were being thrown out." Mathis stated that he overheard Stouth telling Shands about the alleged incident earlier that morning.

### 3. Shilo Shands

Shands testified that she was visiting her friend, Mathis, on September 23 when they heard fighting coming from the connected unit. Shands's testimony corroborated Mathis's adding that she heard the male yelling at the female that she stole his marijuana. However, Shands denied that Stouth told her she had been bound and assaulted earlier that morning.

### 4. Bobbie Walters

Walters testified that she and Turner were previously engaged, but she left him three days before their wedding day due to his infidelity. Walters ended up living close to Turner and Stouth's duplex—she estimated she lived about ten feet away. According to

4

Walters, she and Turner remained friendly after their breakup, and she denied any sexual relationship after the split. On September 23, Walters and Turner were spending time together and she went to his home. Walters stated that Turner "wanted [her] to whoop [Stouth]," but she did not do so. Walters claimed that Turner told her that he had choked Stouth and smashed her phone.

While Walters was in the home, she heard Turner and Stouth arguing over Stouth's phone and Turner trying to get her to leave. Walters explained that she did not initially see duct tape or rope on the dining room table, but after she walked outside and back in the home, the duct tape and rope were on the table.

### 5. Officer Kaylen Santiago

Gatesville Police Department Officer Kaylen Santiago testified that she responded to a call for a verbal altercation on September 23, 2019. Upon arriving on scene, Officer Santiago noted there was "a lot of commotion," so she ended up separating Turner and Stouth in the yard. The "gist" of what Turner told Officer Santiago was that he wanted Stouth out of his home because "he was tired of dope heads in his house." Although Stouth did not initially inform Officer Santiago about what happened, Stouth eventually did.

Officer Santiago took several photographs of Stouth at the scene, which were admitted as exhibits. Some of the photographs depict used black electrical tape found behind the bedroom door, used blue duct tape found in the trash can in the bathroom, and a sash for a robe. Other photographs depicted Stouth's appearance at the time, including some redness around her neck and bruising and redness around her arms.

5

Although it cannot be seen from the photographs, Officer Santiago testified that Stouth's legs had residue from tape on them. Officer Santiago observed Stouth to have a raspy voice and that she was coughing.

**6.      Verdict**

The jury found Turner guilty of aggravated kidnapping. Turner elected for the trial court to assess punishment and it imposed a sentence of forty years' confinement.

## B.      Motion for New Trial

Following the entry of the judgment, Turner filed a motion for new trial. Therein, Turner explained that since the guilt-innocence phase of trial, Stouth had passed away. Turner alleged that his counsel "discovered material evidence favorable to the accused that would probably bring about a different result in a new trial." Specifically, Turner alleged that the Coryell County District Attorney's (DA) Office paid for Stouth's plane ticket from Washington state to Texas and paid for her hotel accommodations during the week of trial. According to Turner, "Stouth was using illegal drugs and unprescribed prescription drugs from the day she arrived . . . through the end of trial," which was inconsistent with Stouth's testimony at trial. In furtherance of Stouth's drug use, Turner alleged she had "several visitors to her hotel room."

Moreover, Turner alleged that Stouth's testimony at trial that she was a nurse in Washington from 2011 to 2015 was false. Turner suggested that Stouth's testimony "likely bolstered her credibility." Stouth testified that she was unable to complete a Sexual Assault Nurse Examination (SANE) because she did not have a ride, but Turner discovered after trial that someone gave Stouth a ride to a home in Temple, "which is

6

where Scott & White [Hospital] is located and where the SANE exam was supposed to take place."

Turner also alleged that the State withheld or failed to disclose favorable, material evidence in violation of *Brady v. Maryland*.[2] *See* 373 U.S. 83, 87 (1963). The trial court heard evidence supporting Turner's motion, which we summarize below.

### 1. Jonathan Aguilar

Jonathan Aguilar testified that he had known Stouth for about three years. During the week of trial, Stouth reached out to Aguilar, asking him to supply her with heroin. Several messages between Stouth and Aguilar were admitted into evidence, which corroborated Aguilar's testimony. However, Aguilar said that he never provided Stouth with any drugs and did not witness her use any the week of trial. Aguilar also was not sure whether Stouth procured any pills after she arrived in Texas, which Turner alleges she did.

### 2. Matt Cole

Matt Cole testified that he had known Stouth for two to three years. Cole was with Stouth the morning after the alleged kidnapping, when she called him to ask for a ride to Temple. According to Cole, he and Stouth did not stay in contact after she moved back to Washington, but she did reach out to him shortly before coming back to Texas to testify. Cole explained that he and Stouth got lunch at a local restaurant before going back to Stouth's hotel room, but he left shortly thereafter. The following colloquy occurred:

---

[2] Originally, Turner alleged fifteen separate *Brady* violations; however, on appeal Turner only argues four of those alleged violations. Many of the previously alleged violations involved information or evidence that did not exist until after the guilt-innocence phase of trial.

| [Defense Counsel:] | Did she buy you lunch? |
| --- | --- |
| [Cole:] | Well, she charged lunch, yes. |
| Q. | To who? |
| A. | The DA's office, I believe. |
| Q. | So she charged your lunch to the DA's office? |
| A. | Yes. |
| Q. | And did she—was there an issue with that with the [restaurant] being able to accept payment? |
| A. | Yes, there was. That's when I stepped outside because I didn't know what was going on at that point. I didn't realize that anything was going on. I didn't know she was buying my lunch through the DA's office or nothing like that. She just asked me what I wanted to eat. |
| Q. | But then when an issue occurred, she asked you to go wait at the hotel? |
| A. | Yes. Not at the hotel. I went outside. I was outside the hotel, yeah. |

Cole explained that although Stouth asked him to help her procure drugs, he did not do so, nor did he see her possess any. Cole recalled that Stouth did say she had smoked something previously. Although Cole signed an affidavit, averring to certain facts, during his testimony he maintained that he only "skimmed over it" and was not sure about the facts contained therein. Specifically, the affidavit claimed that Stouth used heroin; however, he was not sure whether it was heroin or OxyContin. Moreover, Cole could not confirm that he saw Stouth on October 20, the day she testified, despite the affidavit saying as much. When asked how the defense came up with the date of October 20, Cole responded, "Not a clue."

8

### 3. Jacob Harrington

Jacob Harrington testified that he had known Stouth for about three years. Although he and Stouth did not have contact while she lived in Washington, Harrington explained that she reached out to him once she arrived in Texas. According to Harrington, Stouth immediately started asking if he could obtain drugs for her. Harrington claimed that he provided Stouth with black tar heroin, Xanax, meth, and GHB.[3] Harrington witnessed Stouth use those drugs in her hotel room during the week of trial. Copies of purported Facebook messages between Harrington and Stouth were admitted. Although the messages show to be between Harrington and "Wesley Armstrong," Harrington explained that the messages were between he and Stouth. In portions of the messages, Harrington refers to the person as "Heather."

After reviewing the messages, Harrington believed that he briefly visited Stouth in her hotel for the first time on October 18, then again the morning of October 19. Harrington testified that on the morning of October 19, he "got her high" before she went to court to testify. Harrington stayed the night with Stouth at her hotel room, though he could not remember which day.

---

[3] The record does not illuminate what GHB is; however, according to the United States Drug Enforcement Administration, GHB is Gamma-Hydroxybutyric acid and is used to treat daytime sleepiness and muscle weakness associated with narcolepsy. *See* UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, GHB–Gamma-Hydroxybutyric Acid, https://www.dea.gov/factsheets/ghb-gamma-hydroxybutyric-acid (last visited August 16, 2023) ("GHB and its analogs are misused for their euphoric and calming effects and because some people believe they build muscles and cause weight loss. GHB and its analogs are also misused for their ability to increase libido, suggestibility, passivity, and to cause amnesia (no memory of events while under the influence of the substance)—traits that make victims who unknowingly consume GHB vulnerable to sexual assault and other criminal acts.").

### 4. Braden Atterbury

Braden Atterbury testified that he visited Stouth at her hotel the week of trial. According to Atterbury, he and Stouth smoked marijuana together one night and he slept in the recliner in the hotel room. Atterbury did not see Stouth use any other drugs. The next morning, Atterbury witnessed "Harrington put a needle in his arm," prompting him to leave because it made him uncomfortable.

### 5. James Strunk

James Strunk is an investigator for DA's office with approximately twenty-eight years in law enforcement. Strunk testified that he was tasked with picking up Stouth from the airport when she arrived in Texas on October 17. He then took her to the DA's office for a meeting. Strunk had met Stouth once before and, based on his interactions, he did not believe she was under the influence of drugs. Strunk denied giving Stouth a ride any other time the week of trial.

### 6. Laurie Parker

Laurie Parker. a legal assistant for the DA's office, participated in a meeting with Stouth on October 17, and took her to her hotel after the meeting concluded. Parker saw Stouth again the week of trial at the DA's office and at trial. Parker denied going back to the hotel any time during the week of trial.

Parker explained that she sat with Stouth during trial, while waiting for Stouth to testify. Parker testified that Stouth did not talk to her about any of the allegations of drug use in Turner's motion for new trial. When asked if the State turned over evidence that Stouth was reprimanded "for buying somebody else a meal," Parker responded, "No."

10

### 7. Jon Holman

Jon Holman is a private investigator who was appointed to assist with Turner's defense. Holman testified that he was familiar with the discovery provided for trial and absent from that discovery was that "Stouth had had a home visit in Little River Academy with the [State]." Holman also agreed that the State did not disclose that it was providing for Stouth's flight, hotel, or meals during trial. Holman agreed that the State was unaware of Stouth's drug use during trial.

### 8. Result

The trial court denied Turner's motion for new trial. No findings of fact or conclusions of law were requested by Turner or filed by the court. This appeal followed.

## II. MOTION FOR NEW TRIAL

Turner sought a new trial alleging (1) newly discovered evidence; (2) perjured testimony; and (3) *Brady* violations. We review each complaint in turn.

## A. Newly Discovered Evidence

### 1. Applicable Law and Standard of Review

"A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PRO. ANN. art. 40.001. To obtain relief under article 40.001, the defendant must show:

(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;

(2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;

(3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

11

(4)	the new evidence is probably true and will probably bring about a different result in a new trial.

*State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017).

"The trial court has discretion to decide whether to grant a new trial based upon newly[ ]discovered evidence, and its ruling will not be reversed absent an abuse of discretion." *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). "[T]he trial judge determines the credibility of the witnesses and whether the new evidence is probably true." *Id.* "[I]n the absence of any specific findings of fact from the trial court (either oral or written) spread on the record, a reviewing court must assume that the trial court resolved all fact issues in a way that is consistent with its ultimate ruling, so long as those presumed findings of fact are supported by the record." *Francis v. State*, 428 S.W.3d 850, 855 (Tex. Crim. App. 2014).

## 2.	Analysis

Turner argues that he is entitled to a new trial based on newly discovered evidence of Stouth's "unabated and unchecked drug orgy" the week of trial. Specifically, Turner points to Aguilar and Cole's testimony that Stouth reached out to them to purchase drugs and Harrington's testimony that he and Stouth used heroin together. However, in order to be entitled to a new trial, the newly discovered evidence may not be merely impeaching. *See Arizmendi*, 519 S.W.3d at 149. Turner argues that the evidence of drug use goes to Stouth's credibility. *See Diamond v. State*, 613 S.W.3d 536, 545–56 (Tex. Crim. App. 2020) ("[I]mpeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." (cleaned up)). Indeed, the newly discovered evidence, and Turner's use of it in his argument for a new trial, relate to impeaching Stouth's credibility. *See id.*

12

Moreover, without the benefit of findings of fact from the trial court, we must presume that it found that Harrington, the only witness who testified to seeing Stouth use drugs, was not credible. *See Francis*, 428 S.W.3d at 855. Accordingly, Turner has failed to satisfy all four prongs required for a new trial. *See Arizmendi*, 519 S.W.3d at 149.

**B.      Perjured Testimony**

**1.      Applicable Law and Standard of Review**

"The Fourteenth Amendment prohibits the knowing use of perjured testimony by the prosecution." *Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 678–79, (1985)). A prosecutor is obligated to correct any perjured testimony given by one of their witnesses, even when the prosecutor does not instigate the perjury. *Id.* "A due process violation is established if the prosecutor knowingly uses perjured testimony[,] and the reviewing court cannot determine beyond a reasonable doubt that the testimony was harmless." *Id.* at 239 n.19 (citing *Bagley*, 473 U.S. at 679 n.9). An appellant challenging testimony as perjured has the burden to demonstrate that the witness lied and was not simply mistaken. *See id.* ("Appellant has failed to demonstrate that [the witness] lied . . . it is possible that [he] was simply mistaken.").

**2.      Analysis**

Turner argues that the State relied on perjured testimony by Stouth and had a duty to correct it. Specifically, Turner points to Stouth's testimony that she was a nurse in Washington state between 2011 and 2015. As evidence that Stouth's testimony was false, Turner offers a letter from Helen Budde, a case manager for Washington's Nursing

13

Care Quality Assurance Commission,[4] which states: "After an extensive search, I did not locate any licensed providers with the name Heather Stouth or Heather Lord in the [Department of Health] licensing database." However, the letter suggests that Heather Stouth or Heather Lord are not *currently* licensed in Washington—it does not demonstrate that Stouth was never licensed in Washington.[5] Accordingly, the record is insufficient to establish that Stouth lied about her nursing history. *See Vasquez*, 67 S.W.3d at 239.

## C.    *Brady* Violations

### 1.    Applicable Law and Standard of Review

The State has a constitutional duty to disclose material, exculpatory evidence to a defendant. *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011); *see Brady*, 373 U.S. at 88 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). However, the State is not required to disclose evidence that it does not have in its possession and does not know exists. *Id.* The State is not required to disclose evidence if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources. *Id.*

To succeed on a *Brady* violation, an appellant must show that the withheld

---

[4] The Nursing Care Quality Assurance Commission changed its name to the Washington State Board of Nursing effective July 24, 2023. *See* WASHINGTON STATE BOARD OF NURSING, Washington State Nursing Commission Name Changed to Board of Nursing, available at https://nursing.wa.gov/about-us/our-name-change (last visited August 17, 2023).

[5] We note that the Washington State Board of Nursing website states that they "will not verify credentials that are pending, closed, or have only been issued a temporary practice permit." WASHINGTON STATE BOARD OF NURSING, Verify a License, available at https://nursing.wa.gov/licensing/verify-license (last visited August 17, 2023).

14

evidence is favorable, which means that if disclosed and used effectively, it may make the difference between conviction and acquittal. *Id.* at 811(citing *Bagley*, 473 U.S. at 676). This includes both exculpatory evidence (that which may justify, excuse, or clear the defendant from alleged guilt) and impeachment evidence. *Id.* at 811–12.

The suppression of favorable evidence only violates due process if it is material to guilt or punishment. *Id.* at 812. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 109–10 (1976)). Thus, we balance the strength of the suppressed evidence against the evidence supporting the conviction to determine if it is material. *Id.* We consider the suppressed evidence collectively, rather than item-by-item. *Id.* "And it is important to consider how disclosure could have affected defense preparation, with an awareness of the difficulty of post-trial reconstruction." *Id.* (citing *Bagley*, 473 U.S. at 683).

Finally, the suppressed evidence must be admissible. *Id.* at 814.

### 2. Analysis

Turner presents four points that he argues constitute *Brady* violations: (1) a meeting between Stouth and the State where Stouth stated she did not want to testify and the State convinced her by telling her about other women Turner had "done the same thing to"; (2) the State paid for Stouth's hotel room and meals throughout the week of trial; (3) Stouth was reprimanded by the State for using funds to purchase food for Cole; and (4) Stouth spent time with Cole during the week of trial.

As to the undisclosed meeting between Stouth and the State, Turner

15

acknowledges that the State encouraging—rather than discouraging—a witness to testify does not constitute a due process violation. Turner does, however, broadly argue that once a witness appears at trial due to threat or duress "the defendant has the right to confront such witness and can highlight the fact of threat or duress that may impact the credibility of the witness." While this may be true, Turner did not present any evidence that Stouth was under threat or duress. Thus, Turner has failed to show that this evidence is favorable—exculpatory or impeaching—which is necessary to succeed under a *Brady* violation. *See Pena*, 353 S.W.3d at 811–12; *see also Stovall v. Cockrell*, No. 3:00-CV-1407-P, 2003 WL 21750707, *19 (N.D. Tex. July 29, 2003), *report and recommendation adopted*, No. 3:00-CV-1407-P, 2003 WL 22289958 (N.D. Tex. Aug. 21, 2003) ("[T]here is no corresponding violation of the right to present a defense when the statements or 'threats' of the prosecutor encouraged, rather than discouraged, testimony from a witness.").

Next, Turner complains that the State failed to inform him that the State paid for Stouth's hotel room and meals during the week of trial... Although Turner outlines this point as *Brady* evidence in his brief, he provides no argument relating to it specifically; rather, his argument relates to Stouth's use of the expense account to buy Cole's lunch: "Failing to[] inform the defense about [Stouth's] bad act—misuse of her expense account—certainly falls into impeachment evidence as a demonstration of dishonesty." *See* TEX. R. APP. P. 38.1(i) (requiring that appellant's brief contain a clear and concise argument with references to the record and supporting authority). However, the State is required by law to reimburse expenses such as transportation, hotel, and meals that a

16

witness subpoenaed to appear in court who resides outside of the state or county of prosecution incurs. TEX. CODE CRIM. PROC. art. 35.27, § 1.

Moreover, it is unclear whether Stouth actually purchased Cole's lunch using the State's expense account, whether the State was aware of it, or whether the State reprimanded her for doing such. The only evidence in the record supporting this argument was Cole's affidavit, which he said he did not write and only "skimmed over it" before signing. According to the affidavit: "[Stouth] had lunch from Rancher's purchased for [Cole] and the lady from the DA's office came and paid for it. [Stouth] got into trouble for doing that. [Cole] was waiting at [Stouth's] hotel room for her to bring the food back to the room." Cole's testimony was inconsistent at trial. He testified that Stouth was charging the meal to the State, but there was a problem, so he walked out and waited but did not go into her hotel room.

Lastly, Turner complains that the State did not disclose that Stouth spent time with Cole during the week of trial. However, there is nothing in the record that shows the State was aware of any such occurrence. *See Pena*, 353 S.W.3d at 810. Even assuming the State did know, Turner does not explain how this evidence is favorable or material.[6] *See id.* at 810–12.

Ultimately, even if we were to consider each of these four points, we cannot say the disclosure of the evidence had a reasonable probability of changing the outcome of the trial if disclosed to the defense. *See id.* at 812. Evidence that the State met with Stouth

---

[6] According to Turner, "the record is clear that the undisclosed matters could have been used to discredit the accuracy of [Stouth]'s recall of the events in question, a critical aspect of the State's case." But without further explanation from Turner, we are unable to determine how any of the complained-of evidence would discredit Stouth's recollection of the event. *See* TEX. R. APP. P. 38.1(i).

and she was hesitant to testify was revealed at trial and thus considered by the jury. *See id.* The State fulfilling its statutorily mandated responsibilities to pay for a witness's food, lodging, and transportation does not bear a reasonable probability of changing the outcome. *See id.* Finally, Stouth spending time with Cole during the week of trial and potentially using State funds to buy him lunch would have minimal effect, if any. Turner presented no evidence that Stouth knew or should have known that she was not permitted to purchase lunch for Cole. Although Turner alleges Stouth spending time with Cole is material, he provides no explanation as to how it is, and we see none. *See id.*

**D.     Conclusion**

We have reviewed each argument for a motion for new trial under their respective standards of review, and we conclude the trial court did not err in denying Turner's motion for new trial. Appellant's first issue is overruled.

### III.     SUFFICIENCY OF THE EVIDENCE

By his second issue, Turner argues that the evidence was legally insufficient to support the deadly weapon finding in the judgment.[7] Having reviewed the judgment, there is no deadly weapon finding. Moreover, a review of the reporter's record demonstrates that the jury was not asked and did not find that Turner used a deadly weapon. Accordingly, Turner's second issue is overruled.

### IV.     CONCLUSION

We affirm the trial court's judgment.

---

[7] Turner does not challenge the deadly weapon finding as an element of aggravated kidnapping, rather, he exclusively requests this Court to "remand this matter with orders to strike the deadly weapon allegation from the judgment." *See* TEX. PENAL CODE ANN. § 20.04(a) (setting out aggravating factors for kidnapping that do not require the use of a deadly weapon).

18

CLARISSA SILVA<br>Justice

Do not publish.
Tᴇx. R. Aᴘᴘ. P. 47.2(b).

Delivered and filed on the
30th day of August 2023.